134 N.J. Super. 124 (1975)
338 A.2d 833
UNITED STATES TRUST COMPANY OF NEW YORK, ETC., PLAINTIFF,
v.
THE STATE OF NEW JERSEY, ET AL., DEFENDANTS.
DANIEL M. GABY, PLAINTIFF,
v.
THE PORT OF NEW YORK AUTHORITY, ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Argued April 8, 1975.
Argued April 9, 1975.
Decided May 14, 1975.
*129 Mr. Robert B. Meyner and Mr. Devereux Milburn (of the New York Bar) for plaintiff United States Trust Company (Messrs. Meyner, Landis & Verdon, attorneys; and Messrs. Carter, Ledyard & Milburn, attorneys; and Mr. Donald J. Robinson (of the New York Bar) Messrs. Hawkins, Delafield & Wood, attorneys).
Mr. Michael I. Sovern (of the New York Bar) and Mr. Murray J. Laulicht, special counsel for defendants (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Mr. Harold S.H. Edgar (of the New York Bar) on the brief).
Mr. Theodore W. Kheel (of the New York Bar) and Mr. Howard Stern for plaintiff Daniel M. Gaby (Messrs. Battle, Fowler, Stokes & Kheel, attorneys, and Messrs. Shavick, Stern, Schotz, Steiger & Croland, attorneys).
Mr. Joseph Lesser (of the New York Bar) for defendant Port Authority of New York and New Jersey (Mr. Francis A. Mulhern, attorney); and Mr. Patrick J. Falvey (of the New York Bar), Ms. Isobel E. Muirhead, Mr. Arthur P. Berg (of the New York Bar), (Mr. Vigdor D. Bernstein, of counsel).
GELMAN, J.S.C.
These are consolidated actions which have as their common subject matter the constitutional validity of legislation of this State creating, and later repealing, a covenant between the States of New Jersey and New York and the holders of bonds issued by the Port Authority of New York and New Jersey (Port Authority).[1] The *130 first legislative act in question, chapter 8 of the Laws of 1962, N.J.S.A. 32:1-35.50 (the 1962 covenant), authorized the Port Authority to construct the World Trade Center and to acquire and operate the Hudson & Manhattan Railroad Company. As part of the 1962 legislation the two States enacted a statutory covenant with each other and with the holders of certain Port Authority bonds whereby the States and the Port Authority were precluded from applying the Authority's revenues and reserves for passenger railroad purposes unless permitted by the criteria set forth in the statute. N.J.S.A. 32:1-35.55.
The 1962 covenant was repealed by chapter 25 of the Laws of 1974.[2] The complaint filed by the United States Trust Company challenges the constitutionality of the repeal act of 1974, and the Gaby complaint attacks the validity of the 1962 covenant. We turn, then, to the procedural history of these actions and the issues projected by the respective pleadings.

Procedural History

1. The Gaby Action

On May 16, 1972 plaintiff Daniel Gaby filed a class action complaint for a declaratory judgment that the 1962 covenant violated the Federal and State Constitutions. The complaint named as defendants the Port Authority, its commissioners and executive director, and the then Governor of New Jersey, William T. Cahill. On October 25, 1972, on *131 the motion of the Attorney General of New Jersey, the complaint was dismissed as to former Governor Cahill. The Attorney General also moved to dismiss the complaint for failure to name as an indispensable party the Port Authority's bondholders. No disposition appears to have been made of the motion at that time.
The Gaby complaint alleges, among other things, that the residents of the State of New Jersey are dependent upon mass transit facilities and are adversely affected by the deterioration of such facilities within the District serviced by the Port Authority (the Port District). It is alleged that the Port Authority was created by the Compact of 1921 and consented to by the United States Congress[3] to assure "cooperation of the two states in the future development" of transportation facilities within the Port District, and that by virtue of the 1962 covenant, restricting the Port Authority's power to acquire or operate passenger rail transit facilities, the two states entered into a new "Compact" without the consent of Congress and in violation of U.S. Const., Art. 1, § 10. The complaint further alleges that the 1962 covenant constitutes an unconstitutional surrender by the State of its sovereign powers "to protect the health, general welfare and safety of the people," and that it has impaired and obstructed existing facilities for the transportation of goods in interstate commerce, in violation of U.S. Const., Art. 1, § 8.
Gaby asks for multifarious relief. Aside from seeking a declaration as to the unconstitutionality of the 1962 covenant, he asks the court to declare the covenant to be subject to repeal, and to direct the Port Authority to formulate and submit to the court a plan for the development of mass transit facilities within the Port District.
The Gaby action was pretried on February 22, 1973, at which time it was stipulated that the action could proceed *132 as a class action without formal notice to the class represented by plaintiff. Thereafter both sides moved for summary judgment, and oral argument on the motions was heard on September 26, 1973. At the conclusion of the argument the court directed the parties to submit further briefs on the constitutional issues and on the question whether the bondholders were necessary parties to the Gaby action. Following conferences between counsel and the court, it was agreed the United States Trust Company should be permitted to intervene in the Gaby action as a party defendant to represent the interests of the bondholders in that action. An order to such effect was entered on December 18, 1973, and arguments were rescheduled on the motions for summary judgment.
Prior to the date fixed for the argument the prospects for the adoption of the repeal act became apparent, and further action in the Gaby case was stayed pending future legislative developments.

2. The United States Trust Company Action

The New Jersey Legislature completed action on the repeal act on April 22, 1974, and Governor Brendan T. Byrne signed the bill into law on April 30, 1974. On the same day United States Trust Company (U.S. Trust) filed its complaint on behalf of itself as the holder of Port Authority bonds, as trustee for certain designated issues of Port Authority bonds, and on behalf of all holders of consolidated bonds issued by the Port Authority. The complaint names as defendants the State of New Jersey, Governor Byrne and the Attorney General of New Jersey, and seeks a declaratory judgment that the repeal act violated the Federal and State Constitutions.
U.S. Trust alleges that it is the holder (for its own account and in a fiduciary capacity) of $96,000,000 of consolidated bonds issued by the Port Authority; that the Port Authority was intended, under the terms of the Compact approved by Congress, to be a self-supporting public *133 agency whose obligations were to be and are payable from its net revenues and certain reserve funds; that the 1962 covenant was enacted to protect the Port Authority's existing and future bondholders from the diversion of pledged revenues and reserves to finance deficit mass transit facilities and further to preserve the Port Authority's credit standing; that the Port Authority notified prospective purchasers of its bonds of the existence of the 1962 covenant and purchasers relied on the covenant in purchasing bonds issued by the Port Authority, and that the secondary market for the Port Authority consolidated bonds has been adversely affected by the repeal act.
The complaint alleges that the repeal act violates the "impairment" and "taking" provisions of the Federal Constitution, U.S. Const., Art. I, § 10 and Amends. V and XIV, and the equivalent provisions of the New Jersey Constitution, N.J. Const. (1947), Art. IV, § VII, par. 3; Art. I, pars. 1 and 20.
The answer filed by defendants asserts several defenses among which the following may be briefly noted: (1) the repeal act constitutes a reasonable exercise of the police power by the State; (2) the 1962 covenant itself violated the Federal Constitution because of lack of congressional consent; (3) the repeal act does not constitute an "impairment" of the contract since the obligation of the Port Authority to pay its bondholders remains intact; (4) the bondholders were on notice of the reserved powers of the State to repeal the 1962 covenant, and (5) the repeal act was adopted as a police power measure to meet a transportation crisis affecting the health, safety and welfare of persons residing within the District. Finally, the answer asserts a counterclaim for a declaratory judgment that the repeal act is constitutional.
A consent order was entered pursuant to R. 4:32-1 in the U.S. Trust action directing that the action be maintained and defended as a class action by U.S. Trust on *134 behalf of all holders of consolidated bonds of the Port Authority, and that notice to the class be deemed to have been given by means of the media publicity which was disseminated when the action was instituted. On December 10, 1974 the Gaby and U.S. Trust actions were consolidated by order of the court.
The parties to the U.S. Trust action have filed a 366-page stipulation of facts, accompanied by exhibits covering all phases of the case with the exception of two issues: (1) whether the purchasers of consolidated bonds issued by the Port Authority after the adoption of the 1962 covenant relied in fact upon the existence of the covenant, and (2) whether the repeal of the 1962 covenant adversely affected the secondary market for Port Authority bonds. These issues were the subject of a trial on February 4, 5, 6, 7 and 11, 1975, and the court's findings on the issues will be set forth infra.

The Formation, Facilities and Financial Structure of the Port Authority.

1. Formation and Facilities.

In 1917 the States of New Jersey and New York established the New York, New Jersey Port and Harbor Development Commission (the Commission) to study the facilities and problems of the Port of New York and to recommend a plan for the future development of the Port.[4] The Commission filed its Report[5] on December 16, 1920 *135 setting forth its findings, conclusions and recommendations. The core recommendation of the Commission was the creation by the two states of a common public agency by means of which the states would cooperate in the future development of the facilities of the Port in accordance with the comprehensive plan recommended by the Commission.[6]Report at 436. In discussing the legal precedents for the establishment by the States of an agency having a substantial impact on interstate commerce, the report stated:
Permissive or restrictive, as the case may be, the power of Congress over the instrumentalities of interstate traffic is exclusive, when in a specific case it has been exercised. But this latter limitation, coupled with the broad police power of the State and its control of intrastate commerce, has left to New York and New Jersey a broad field within which they may act without express Federal consent. It is hoped, of course, by securing congressional approval of any plan which may be adopted, to avoid future conflict with the Federal authority over interstate unification and control of the Port. But for the present the States may act alone. [Report at 446]
Prophetically the Commission noted that
[o]ur port problem is primarily a railroad problem. * * * Therefore the comprehensive plan to evolve which this Commission was created is essentially a railroad plan. With the proper network of rail facilities, the development of other terminal facilities can follow along rational lines * * *. A complete reorganization of the railroad system is the most fundamental physical need of the Port of New York. [Report at 3]
However, the railroad problem upon which the Commission focused was not that of passenger transit but the handling and distribution of freight and cargo into and out of the Port District, and the comprehensive plan recommended by the Commission addressed itself exclusively to the transportation and distribution, not of persons but of freight *136 and cargo by rail, and to a lesser extent by ship and motor truck. In its 474 pages plus appendices the only significant discussion of passenger traffic in the Report is contained in the section dealing with ferries and vehicular tunnels. After noting that the bulk of interstate passenger traffic was accommodated by the Hudson River ferries and that the impact of the Holland Tunnel (started in 1920) could not be forecast, the Report opined:
Vehicular tunnels offer little promise as a means of conveying passengers, and the one rapid-transit facility in existence between the two States, while operated to near capacity, is not sufficiently profitable to warrant optimism that others will be built. [Report at 330]
Following the submission of the Commission's Report, the Port of New York Authority[7] was created pursuant to an interstate compact, signed April 30, 1921, between the States of New Jersey and New York. N.J.S.A. 32:1-1 et seq. The consent of Congress "to each and every part and article" of the Port Authority Compact was obtained effective August 23, 1921. Pub. Res. No. 17, 67th Cong. 1st Sess. The preamble of the Port Authority Compact states that "a better coordination of the terminal, transportation and other facilities of commerce in, about and through the port of New York, will result in great economies, benefiting the nation, as well as the states of New York and New Jersey," and that "the future development of such terminal, transportation and other facilities of commerce will require the expenditure of large sums of money, and the cordial co-operation of the States of New York and New Jersey in the encouragement of the investment of capital, and in the formulation and execution of the necessary physical plans."
Article I of the Compact contains the agreement and pledge by the two states of their "faithful co-operation in *137 the future planning and development of the port of New York, holding in high trust for the benefit of the nation the special blessings and natural advantages thereof". Article II defines the Port of New York District, comprising an area of about 1500 square miles in both states within a radius of about 25 miles from the Statue of Liberty. Article III establishes the Port Authority as "a body corporate and politic, having the powers and jurisdiction hereinafter enumerated, and such other and additional powers as shall be conferred upon it by the legislature of either state concurred in by the legislature of the other, or by act or acts of congress." Article VI vests in the Port Authority "full power and authority to purchase, construct, lease and/or operate any terminal or transportation facility within [the Port] district"; to make charges for the use of such facilities, and "to borrow money and secure the same by bonds or by mortgages upon any property" held by the Port Authority. Article VII provides that the Port Authority "shall have such additional powers and duties as may hereafter be delegated to or imposed upon it from time to time by the action of the legislature of either state concurred in by the legislature of the other," and mandates that the Port Authority shall not pledge the credit of either State except with the consent of its legislature. Article XI requires the Port Authority to make plans for the development of the Port District supplementary to or amendatory of any plan theretofore adopted, and Article XII authorizes the Port Authority to "make recommendations to the legislatures of the two states or to the congress of the United States, based upon study and analysis, for the better conduct of the commerce passing in and through the port of New York."
Article XXII of the Compact defines "transportation facility" to include "railroads, steam or electric * * * and every kind of transportation facility now in use or hereafter designed for use for the transportation or carriage of persons *138 or property", and defines "railroad" as "includ[ing] railways, extensions thereof, tunnels, subways, bridges, elevated structures, tracks, poles, wires, conduits, power houses, substations, lines for the transmission of power, car barns, shops, yards, sidings, turnouts, switches, stations and approaches thereto, cars and motive equipment."
In 1922 the states, with the consent of Congress, adopted a Comprehensive Plan for the development of the Port of New York. N.J.S.A. 32:1-25 et seq.; Pub. Res. No. 66, 67th Cong., 2d Sess. The Comprehensive Plan sets forth the development program initially envisioned by the Commission for implementation by the Port Authority.
In the Plan, like the Report upon which it was based, unification of terminal operations and facilities, consolidation of shipments, adaptation and coordination of existing facilities, improvement of commercial rail, truck and water facilities and other freight handling improvements are set forth as principles to govern the development of the Port Authority. The Comprehensive Plan proposed to establish direct rail freight connections between New Jersey and Manhattan to furnish "the most expeditious, economical and practical transportation of freight especially meat, produce, milk and other commodities comprising the daily needs of the people." N.J.S.A. 32:1-29. Section 8 of the 1922 Comprehensive Plan statute denies to the Authority the power to levy taxes or assessments, and provides that the bonds or other securities issued by the Port Authority shall at all times be free from taxation by either state. N.J.S.A. 32:1-33. Finally, it should be noted that the power was reserved to the states to add to, modify or change any part of the Plan. N.J.S.A. 32:1-26.
Pursuant to the Compact, the Comprehensive Plan and subsequent amendments and supplements thereto, the Port Authority operates all of the interstate vehicular tunnels and bridges in the Port District, which include the Holland *139 Tunnel[8], the Lincoln Tunnel, the George Washington Bridge, the Bayonne Bridge and the Arthur Kill Bridges. In addition, the Port Authority owns and/or operates the following facilities: Newark International Airport, Teterboro Airport, LaGuardia Airport, John F. Kennedy International Airport and two heliports; Port Newark, the Hoboken Port Authority Marine Terminal, the Elizabeth Port Authority Marine Terminal, the Columbia Street Marine Terminal, the Erie Basin Port Authority Marine Terminal and a Mid-Manhattan Consolidated Passenger Ship Terminal; the Port Authority Bus Terminal, the George Washington Bridge Bus Station and the Newark and New York Union Motor Truck Terminals; the Port Authority Trans-Hudson system (operated for the Port Authority through its wholly-owned subsidiary, the Port Authority Trans-Husdon Corporation) and the World Trade Center.
Excluding the 1921 Compact and the 1922 Comprehensive Plan, the Legislatures of New Jersey and New York have adopted 39 separately enacted, concurrent statutes authorizing the construction and financing of the foregoing facilities, the issuance of bonds and notes by the Authority, the regulation of suits against it, and the establishment of a general reserve fund for the payment of the Authority's obligations. None of these 39 statutes received specific Congressional consent.

2. The Financial Structure of the Port Authority

Under the terms of the Compact the power to levy taxes or to pledge the credit of either state was expressly withheld from the Authority. From its inception, with the exception of monies advanced as loans by the states, the Authority was *140 required to finance its facilities solely with money borrowed from the public and to be repaid out of the revenues derived from its operations. By reason of these financial limitations two concepts initially emerged which have played an important role in the realization of the purposes for which the Authority was created: first, the specific projects undertaken by the Authority should be self-supporting, i.e., the revenues of each should be sufficient to cover its operating expenses and debt service requirements; and second, since the Authority is a public agency over which its creditors have no direct control, the bondholders should be protected by covenants with the Authority and with the states which have ultimate control over its operations.
The first facilities constructed by the Authority were vehicular spans linking Staten Island and New Jersey  the Arthur Kill Bridges  which were opened to traffic in 1928. A third Staten Island-New Jersey crossing, the Bayonne Bridge, was placed in operation in 1931. In that same year the George Washington Bridge was opened to traffic. With respect to each of these facilities the Port Authority was authorized to and did issue bonds in separate series to pay for the cost of acquisition of lands and construction. The revenues and tolls from each facility were statutorily pledged as security for the repayment of the series bonds issued in conjunction with the specific facility involved. N.J.S.A. 32:1-39, 62, 86. The States of New Jersey and New York advanced additional moneys to pay for the costs of construction, and the funds so advanced were accorded a subordinated status to the funds raised by the Authority from the sale of its own bonds to the public. N.J.S.A. 32:1-60, 63, 81, 87. The statutory authorizations for each project and its funding were declared to be "a contract or agreement between the two states for the benefit of those lending money to the port authority." N.J.S.A. 32:1-65, 89.
The first bonds issued to the public by the Authority were "closed-end" bonds based on the estimated costs of each facility, and the Authority was prohibited from issuing more *141 bonds than the amount initially authorized for the project. See Goldberg, A History of the Port of New York Authority Financial Structure (1964), at 3 (hereafter cited as Goldberg). The gross revenues from each bridge were applied first to the payment of expenses of operation and maintenance of the bridge, then to the payment of debt service on its bonds, and the surplus, if any, was to be deposited in a separate reserve fund available only to the bondholders of that series. Goldberg, at 4.
As noted earlier, the initial facilities were not self-sustaining, and in 1930 the states transferred the control, operation and the revenues of the Holland Tunnel to the Port Authority to help place the Port Authority on a self-sustaining basis. N.J.S.A. 32:1-119. Simultaneously, the states enacted legislation, commonly called the General Reserve Fund Act, N.J.S.A. 32:1-142, and by the terms of that act the surplus revenues derived by the Authority from all facilities built with the proceeds of sale of its bonds are pooled so as to create a general reserve fund in an amount equal to 10% of the par value of all bonds issued by the Authority. The act pledges the general reserve fund as security for the payment of interest and principal on all bonds theretofore or thereafter issued by the Authority. Surplus moneys of the Authority in excess of the general reserve fund requirements may be used for any purpose authorized by the states.
The general reserve fund thus becomes available to bondholders to pay the debt service requirements of facilities which were not self-supporting. By this device the surplus revenues of the Holland Tunnel were used to pay the debt service requirements of the Arthur Kill and Bayonne Bridges and the George Washington Bridge. The general reserve fund was also envisioned as a security device to induce the public to invest in future facilities such as the then contemplated Lincoln Tunnel project. See Goldberg, at 7.
Following the enactment of the General Reserve Fund Act the Port Authority issued additional series of bonds to finance the construction of the Inland Terminal Building and to repay *142 the states for the amounts expended by them to construct the Holland Tunnel. Goldberg, at 5. In 1935 the Authority commenced the issuance of a new series of bonds, known as general and refunding bonds, the proceeds of which were used to refund all of the original bridge bonds issued by the Authority and to finance the initial construction of the Lincoln Tunnel. These bonds were secured by a pledge of the net revenues of all of the Authority's then existing facilities and by the general reserve fund. Under the terms of the resolution authorizing the issuance of general and refunding bonds the Authority also contracted to create a special reserve fund into which would be paid all net revenues in excess of those required to pay the operating expenses of the Authority's facilities, the debt service requirements for the general and refunding bonds, and to maintain the general reserve fund at its prescribed level. Goldberg, at 11. The authorizing resolution imposed limitations on the use of the special reserve fund for the benefit of the bondholders.
In 1947 the Authority commenced the issuance of air terminal and marine terminal bonds, the proceeds of which were used for the acquisition and construction of various airport and marine terminal facilities. These bonds were secured by a pledge of the revenues of the specific facilities financed thereby, as well as by a call upon the general reserve fund to the extent that revenues from the facilities were insufficient to pay operating expenses and debt service requirements. As in the case of the general and refunding bonds, the air and marine terminal bond resolutions provided for their own special reserve funds for the benefit of the bondholders of each of these series.
In 1952 the Commissioners of the Port Authority embarked upon a new scheme for future financing which abandoned the practice of earmarking specific facility revenues as security for its bonds. On October 9, 1952 the Authority adopted the Consolidated Bond Resolution (the CBR), authorizing the issuance of consolidated bonds to serve as the medium for financing its activities in furtherance of any purpose for *143 which the Authority is authorized to issue bonds secured by a pledge of the general reserve fund.[9] Consolidated bonds constitute general obligations of the Authority, and all such bonds are equally and ratably secured by a pledge of the net revenues of all existing facilities and any additional facilities which may be financed in whole or in part by the issuance of consolidated bonds.[10]
With the adoption of the CBR the "self-supporting" facility concept which had governed earlier authority financing ceased to have the significance previously attached to it; for under the CBR the Authority's financial structure is based on a unitary enterprise concept and all revenues from all facilities are pooled. Individual facilities are not financed independently of the rest of the Authority. The facilities contribute their revenues for debt service on all Authority bonds according to their earning power and without regard to the amount of bonds issued for the construction of any particular facility.
While some facilities may not yield sufficient revenues to pay operating expenses and/or debt service requirements, what is of paramount concern to bondholders under the CBR is whether the total revenues of the Authority are sufficient to satisfy all of its obligations to bondholders. And in order to ensure that the abandonment of the "facility-by-facility" approach would not lead to a dilution of pledged revenues and reserves, the CBR contains covenants with the bondholders with respect to future operations and activities of the Authority and the issuance of bonds secured by a pledge of its revenues and reserves.
*144 One of the principal protections afforded bondholders by the CBR is the so-called "1.3 test" contained in section 3.[11] The 1.3 test prohibits the issuance of new consolidated bonds unless the best one-year net revenues of all of the Port Authority's facilities equal or are greater than 1.3 times the prospective debt service for the calendar year during which the debt service of all outstanding and proposed new bonds secured by a pledge of the general reserve fund would be at a maximum.[12] The 1.3 test is thus an equation in which one component consists of the Authority's net revenues from all facilities, and the other component is the maximum annual debt service required to be paid on all Authority bonds, including the new bonds to be issued. The maximum annual debt service component is readily calculable from the requirements set forth in the resolutions authorizing the bond issues.
The annual net revenue component of the equation consists of the Authority's historical net revenues from existing facilities[13] plus the estimated average annual net revenues of the facility to be acquired or constructed with the issuance *145 of new bonds.[14] While the 1.3 test speaks only of estimated net revenues and not of "deficits," it is evident from the purpose of the 1.3 test as well as Authority practice in arriving at historical net revenues that the estimated average annual deficits of a new facility must be charged against historical revenues in determining whether the 1.3 test has been met. The purpose of the 1.3 test is to protect existing bondholders against dilution of pledged revenues and reserves; if consolidated bonds are issued to acquire or construct a substantial deficit operation whose drain on Authority revenues is not included in the earning's component, the 1.3 test would be meaningless. Further, it is to be noted that in calculating historical net revenues of existing facilities the Authority arrives at one pooled figure which takes into account the deficits of such facilities.
Section 5 of the CBR directs the application of the pledged revenues to the payment of debt service upon all consolidated bonds, with the remaining balance to be paid into the consolidated bond reserve fund except to the extent necessary to be paid into the general reserve fund to maintain it at the level prescribed by statute.
Section 6 of the CBR provides that the payment of debt service upon all consolidated bonds "shall be further secured equally and ratably by the General Reserve Fund." Moneys in the general reserve fund may not be used for any purpose if there are other moneys of the Port Authority available for that purpose, unless there are sufficient funds available to the general reserve fund to pay debt service upon outstanding bonds during the ensuing 24 months, in which event such excess moneys could be used for any purpose permissible under the General Reserve Fund Act, whether or not other moneys were available for that purpose.
Section 7 of the CBR establishes a consolidated bond reserve fund into which all net revenues pledged as security *146 for consolidated bonds (after payment of debt service on all consolidated bonds and of amounts necessary to bring the general reserve fund to its statutory level) are required to be paid. The moneys in the consolidated bond reserve fund may be used only for the payment of: (a) consolidated bonds at maturity, retirement or redemption; (b) debt service upon outstanding consolidated bonds; (c) the deficit of any facility the net revenues of which were pledged as security for consolidated bonds, and (d) "any other additional purposes for which the Authority is now or may hereafter be authorized by law to expend the revenues of its facilities." The pledge of the net revenues of the Authority and of the moneys in the Consolidated bond reserve fund is subject to the right of the Authority to apply the revenues and the reserve fund as provided in section 7, and the right to issue bonds, other than consolidated bonds, secured by the reserve fund if such other bonds "are issued solely to fulfill obligations to or for the benefit of the holders of consolidated bonds and if such other bonds are also secured by a pledge of the General Reserve Fund."
Since the adoption of the CBR, capital expenditures of the Authority have been financed by the issuance of 41 series of consolidated bonds and short term notes. New facilities and improvements to existing ones have been funded without regard to the individual project's ability to generate income. This has enabled the Port Authority to undertake projects which would not be financially feasible alone but are possible because of the surplus revenues generated by its other facilities.[15] New projects undertaken since 1952 include the acquisition and/or construction of two heliports, the Brooklyn, Erie Basin, Elizabeth and Hoboken Marine Terminals, the Port Authority Trans-Hudson *147 (PATH) System, a bus terminal and the World Trade Center.
With respect to each series of consolidated bonds issued, the Authority adopts an authorizing resolution. Section 7 of each series resolution prohibits the issuance of any additional consolidated bonds or any other bonds to be secured by a pledge of the general reserve fund with respect to any facility or group of facilities as to which the Authority has not previously issued bonds unless
* * * the Authority shall certify at the time of issuance its opinion that the issuance of such Consolidated Bonds or that such pledge of the General Reserve Fund as security for such bonds other than Consolidated Bonds will not, during the ensuing ten years or during the longest term of any of such bonds proposed to be issued (whether or not Consolidated Bonds), whichever shall be longer, in the light of its estimated expenditures in connection with such additional facility or such group of additional facilities, materially impair the sound credit standing of the Authority or the investment status of Consolidated Bonds or the ability of the Authority to fulfill its commitments, whether statutory or contractual or reasonably incidental thereto, including its undertakings to the holders of Consolidated Bonds; and the Authority may apply monies in the General Reserve Fund for purposes in connection with those of its bonds and only those of its bonds which it has theretofore secured by a pledge of the General Reserve Fund in whole or in part.
Each consolidated bond states that it "is issued pursuant to and in full conformity with the Compact between the States of New York and New Jersey creating the Authority, and the various statutes of said two States amendatory thereof and supplemental thereto, for purposes provided in said Compact and statutes". No specific statute is mentioned in the bonds.
On December 31, 1970 the Authority placed in trust with the First National City Bank, as trustee, $60,749,000 from the Authority's special reserve fund, air terminal reserve fund and marine terminal reserve fund to secure fully, unconditionally and absolutely the Authority's obligation to provide for the redemption as scheduled and the payment of interest until redemption on the Authority's outstanding *148 general and refunding bonds, air terminal bonds and marine terminal bonds. After the establishment and during the maintenance of these trusts no further payments are required to be made into such reserve funds. As a result the pledge of Authority revenues and reserves to secure repayment of consolidated bonds is no longer subject to the prior lien in favor of the earlier series of bonds. The maintenance of the reserve funds in trust permits the application of all net revenues and reserves of the Authority to the payment of the consolidated bonds.
As of December 31, 1974 the issued and outstanding consolidated bonds of the Authority totaled $1,668,584,000,[16] the general reserve fund contained $173,487,000 and the consolidated bond reserve fund $46,800,000. Gross and net operating revenues for 1974 were $410,412,000 and $156,118,000, respectively. After debt service and sinking fund requirements were met the Authority had available for transfer to its reserve funds $67,018,000, resulting in a net increase in its reserves of $18,293,000 for the year.[17]

The Legislative History of the 1962 Covenant.
So far as the record reveals, the history of New Jersey's involvement with mass transit begins with the enactment of chapter 104 of the Laws of 1922. The Legislature there established the North Jersey Transit Commission[18] to study *149 and report upon plans for providing a comprehensive scheme of rapid passenger transit[19] between northern New Jersey communities and New York City. In its 1925 and 1926 reports this Commission noted both the urgent need for and complexity of a rapid transit plan for the northern New Jersey area which would furnish direct access to the midtown New York City area.
In 1927 the New Jersey Legislature authorized and directed the Port Authority to make plans to provide for rapid passenger transit between the states and within the Port District. Similar legislation was adopted in New York but was vetoed by Governor Alfred E. Smith, who in his veto message noted his unwillingness to have the Port Authority diverted from its principal objective of solving the freight distribution problems within the District. Governor Smith's veto to all intents and purposes ended any legislative effort to involve the Port Authority in an active role in commuter transit for the next 30 years.[20]
The years between 1928 and 1958 were devoted to largely fruitless efforts by numerous groups, agencies and commissions to devise a solution for mass transit within the metropolitan New York-New Jersey area. No useful purpose would be served in cataloging their failures  which were not failures of purpose, effort or imagination, but the failure to find the source of funds required to implement any plan. In the meantime the financial position of existing commuter *150 transit facilities continued to deteriorate. By 1955 the Hudson and Manhattan Railroad had filed a petition for reorganization under the federal bankruptcy laws,[21] and the private railroads were petitioning the Interstate Commerce Commission for permission to abandon ferry service across the Hudson and to discontinue various passenger services because of substantial operating deficits.[22]
In 1958 the Metropolitan Rapid Transit Commission[23] issued a report to the states of New Jersey and New York setting forth a proposal for the construction of a trans-Hudson loop commuter transit system at an estimated capital cost of almost $500,000,000. The report noted the need to coordinate and to achieve a balance between highway and rail transportation systems. The Commission pointed out:
That balance does not exist today. The automobile drivers and the bus operators make use of roadways, tunnels, bridges and central area terminals which are tax free and are either publicly maintained or publicly developed out of user taxes and user fees. Private railroad companies must raise the capital (and pay the interest on it) to build their rights-of-way and provide the operating facilities, and must maintain them and pay taxes on them. Since 1930, billions of public dollars have been spent, and are still being spent, by federal, state and local governments in the development of highways, bridges and other facilities for vehicular traffic, but no public funds whatever have been spent during the same period in promoting or improving *151 mass transportation by rail between the New York and New Jersey portions of the Metropolitan Area.
The imbalance has resulted in a constant and relentless deterioration of suburban rail service. Ferries are being abandoned, train service is reduced, petitions are filed for abandonments, cars are getting older without being replaced. Repeated increases in fares in an effort to match rising costs and to establish earnings which can be used to improve the properties are resisted by public regulatory bodies. The result is more constriction of service by railroads, with consequent further congestion of highway facilities. One very grave consequence has been the creation of a stupendous cycle of traffic congestion in the streets, constantly calling for still further enormous expenditure of public funds for still further vehicular traffic.
Obviously, the people and the governments within this New York-New Jersey Metropolitan area are now face to face with this looming crisis, and can no longer avoid it by conveniently looking the other way.
Capital for the construction of the trans-Hudson loop must be raised by a public agency and bonds issued by it must have some measure of public guarantee to be saleable. Revenue bonds for transit purposes have a bad reputation in the bond market because of the financial history and condition of transit systems. While it would be desirable that the users of the loop would pay through fares the full capital and operating cost all experience conclusively demonstrates otherwise. On the other hand, the public interest requires that the fares be established at a level to foster maximum usage and utility of the system and provisions must be made for possible deficits. In addition, it must be recognized that capital for construction and equipment cannot be secured merely by evidence that revenues will equal costs.
A study which had been prepared for the Commission on the financial structure of the proposed commuter transit system had suggested that "financing would not be available from any of the existing public authorities since this action would in some cases impair the obligations of the authorities' covenants with bondholders and would seriously affect the ability of the authorities to discharge the responsibilities for which they were established." Nevertheless, during the 1958 session of the New Jersey Legislature a bill was introduced (Assembly Bill No. 16) which provided that the Port Authority take over and financially develop, improve and operate interstate passenger rail transportation between *152 New Jersey and New York. The Port Authority submitted a statement to the Legislature in response to this bill in which it said, among other things:
This opposition is based on the conclusion of the Commissioners that: (1) It is legally, financially and contractually impossible for the Port Authority to assume the railroads' increasingly heavy deficits from commuter operations or the cost of developing a new and comprehensive rail rapid transit system; and (2) The assumption of rail transit deficits by the Port Authority, the self-supporting agency of the two States, would immediately cripple and very quickly destroy the program of the two States now under way for the continued development of their essential public port and harbor facilities, airports, and interstate arterial systems.

* * * * * * * *
In addition to the General Reserve Fund, various special reserve funds have been created as a result of contractual commitments with bondholders in support of the various issues of Port Authority bonds. As in the case of the General Reserve Fund, the Authority may apply moneys in the Special Reserve Funds for purposes relating only to those of its bonds secured by a pledge of the General Reserve Fund, including purposes relating to facilities financed by such General Reserve Fund Bonds.
All Port Authority revenues not applied to operation and maintenance and debt service must be paid into one or another of these reserve funds. There are no excess revenues which are free of this contractual commitment to bondholders.[24] [Emphasis supplied]
In its statement to the 1958 Legislature the Authority suggested that even if it were possible to ignore legal restrictions on the use of Authority net revenues to finance commuter rail deficits, such a course of action would impair the Authority's credit standing and adversely affect the ability of the Authority to carry out its then existing programs. To reinforce this view the Authority solicited and included in its statement similar expressions of opinion from members of the investment banking community.
In January 1959 a joint report was issued on Assembly Bill No. 16 by the New Jersey Assembly Committees on *153 Highways, Transportation and Public Utilities, and on Federal and Interstate Transportation. This report concluded that the Port Authority could not be called upon to undertake the entire rail passenger transit obligation because (1) no one could estimate the size of the deficit operation the Authority would be undertaking, and (2) while the Authority could absorb some deficit, its operations, taken as a whole, must be self-supporting.
Pressures for financial aid to and Port Authority involvement in commuter transit continued to mount, and in 1960 the New Jersey Senate created a committee (known as the Farley Committee) to study the financial structure and operations of the Authority. One of the principal subjects investigated by the Farley Committee was the Authority's role in commuter transit. At the time the Committee's hearings commenced its immediate concern was to find a means to continue the operations of the bankrupt Hudson & Manhattan Railroad (H & M). The bankruptcy reorganization proceedings involving the H & M had reached the point where, in 1959, the District Court had left the H & M with sufficient cash for operations to continue for only two years. See In re Hudson & Manhattan Railroad Co., 174 F. Supp. 148 (S.D.N.Y. 1959), aff'd sub nom. Spitzer v. Stichman, 278 F.2d 402 (2 Cir.1960). The Authority's Executive Director, Austin Tobin, testified before the committee concerning his discussions with New Jersey Highway Commissioner Dwight Palmer to have the Port Authority acquire and operate the H & M. Tobin testified in September 1960:
Faced with these legal and contractual commitments [to the Authority's bondholders], which are the whole basis of the Authority's credit, Commissioner Palmer and the Port Authority have been examining, beginning with our initial exploration of the possibility on last February 15, whether bi-state legislation could be fashioned under which the Authority might even acquire and finance the bankrupt and deficit-ridden Hudson & Manhattan properties and finance its modernization by the Port Authority as a new Port Authority facility.
*154 In other words, could any legal and financial plan be worked out that would meet the foregoing contracts with investors and, from the standpoint of maintaining the Port Authority's credit, guarantee that the Authority would not thereupon become generally or further involved in the deficits of the commuter railroads, both in New York and in New Jersey? Obviously, unless such a covenant could be established no Port Authority bonds could be sold either for the acquisition of the Hudson & Manhattan properties or for any other Port Authority purpose.
Thus the core of the problem is whether or not the two States could, to use a phrase about it, `build a statutory fence around' the Hudson & Manhattan by guaranteeing to investors that the Authority would not and could not become involved in the large and increasing deficits of the New York and New Jersey commuter railroads, which with the New York subways total a deficit of something like $150,000,000 a year.
In January 1961 Commissioner Palmer appeared before the Farley Committee and expressed his conclusion that the Port Authority should purchase and operate the H & M provided limitations were placed upon the Authority's role in mass transit. On this subject he testified:
The Port Authority in my opinion must make money and accumulate reserves for the rainy day if it is to be equipped to meet the needs of our two states of New York and New Jersey. It does not have general taxing powers. Its only taxes are the tolls it collects from the users of its facilities. Its shareholders are the public, you and I, and the institutions that buy the bonds. Since the cost of financing often determines the feasibility of a project it stands to reason that you and I get more for our toll dollar in the way of modern and safe facilities if we make certain that the credit rating of the Authority remains intact.
Now most of us realize that the matter of credit is not an exact science. The credit of an organization depends on quite a few factors; past performance, efficient management and calibre of personnel and markets for the product the institution has to sell; and last but not least  what investors think of the operation as a financial risk. It is, in the final analysis, the practical assessment of being repaid money that they lend to it.
Relating specifically to what ultimately became the 1962 covenant, Senator Wayne Dumont questioned Commissioner Palmer as follows:
*155 Q. Commissioner, when the Port Authority made its proposal in September, at our hearings then, to take over the Hudson & Manhattan Tube, they surrounded their proposal with certain restrictions which, so far as I could tell were designed to eliminate any real obligation on the part of the Port Authority beyond taking over the Hudson & Manhattan Tubes, at least so far as the railroad field was concerned. Do you consider those restrictions that they surrounded this proposal with as reasonable ones? A. Yes, I do. And I have so stated in my proposal and I do it purely on the basis of what experience I may have had in the field of finance and industry, and of what we are hoping to obtain and acquire in the future in the expansion of facilities that the Port can supply.

* * * * * * * *
And it seems impossible, from all of my direct  and not through any other channels  direct contacts, to observe that money could be loaned for even the acquisition of the H & M in the event there was not some assurance that this just wasn't one bite of the cherry and that further transportation business was all to be pulled together. I think it's simply a question of whether the investor says yes or no, and at the present time my observation is the investor says no unless he has that limitation.
The following day the Port Authority's Vice-Chairman, James C. Kellogg, III, testified concerning the Authority's H & M plans. He emphasized that only by adopting what became the 1962 covenant could the Port Authority acquire and rehabilitate the H & M.
There is, of course, no possibility whatsoever that either the Port Authority or any one else could operate the H&M on a self-supporting basis. The bankrupt H&M has not paid a dividend since 1932; it has not been able to meet the interest on its bonded indebtedness and has been in receivership since 1954.

* * * * * * * *
On this estimate of the H&M losses [$5 million annually], and if we are able to satisfy prospective investors by statutory assurances that this proposal will not involve the Authority's General Reserve Fund in any other or further commuter deficit operations, we believe we can conscientiously certify, as we must under our indentures, that this financing will not impair the Port Authority's credit. On the other hand, if we are not in a position to cite such statutory assurances to those from whom we will have to borrow the money, and therefore, we are not in a position to make such a certification, we obviously would not be in a position to borrow money for the acquisition, let alone the improvement, of the H&M.

* * * * * * * *
All Port Authority revenues not applied to operation and maintenance and debt service must be paid into one or another of these *156 reserve funds. There are no excess revenues which are free from this contractual commitment to bondholders.
The most important pledges that the Port Authority has made to its bondholders are those relating to the issuance of bonds for new projects. These pledges were necessary since otherwise the security could be diluted, not only through the raiding of revenues and reserves, but just as disastrously by the unlimited issuance of bonds which have such revenues and reserves as their primary source of repayment.
It is because of this that the Port Authority had to covenant with its bondholders not to issue Consolidated Bonds supported by the General Reserve Fund for any new facility unless it can be demonstrated that, including the new facility, net revenues will be sufficient to cover by at least 1.3 times the maximum interest and principal payments due in any future year. Furthermore, bonds for a new facility cannot be issued with a pledge of the General Reserve Fund unless the Port Authority Commissioners certify that the issuance of the new bonds will not materially impair the sound credit standing of the Authority, the investment status of the Authority's bonds, or the ability of the Authority to fulfill its commitments and undertakings. Such protections for investors under open-end revenue bond issues are not uncommon.
Applied to the H&M proposal, I would like to make it clear that the question of whether or not we can borrow the $83,500,000 which is required, is not simply a question of whether or not we would have to pay a higher rate of interest on these funds. We can only submit to you the unanimous view of the Commissioners of the Port Authority that there is no possibility whatsoever of borrowing the money at all without a statutory assurance to investors that any future Port Authority responsibilities in the field of commuter rail transport over and above the present and existing interstate Hudson and Manhattan railroad system will not involve a pledge of the Port Authority's General Reserve Fund.
I say to you as a New Jersey Commissioner, and with all the sincerity that I can command, that there is nothing arbitrary or doctrinaire about this conclusion. It simply represents the Port Authority's credit. My business is investment financing and I say to you gentlemen that I could not sell a single Port Authority bond without such an assurance. If my responsibility were on the other side of the table, I would not buy a Port Authority bond that did not contain such an assurance. [Emphasis supplied]
Following Kellogg's prepared statement he was questioned by Senators Farley and Cowgill as to the binding effect *157 which the proposed covenant legislation could have on a subsequent legislature. The questioning proceeded as follows:
BY SENATOR FARLEY:
Q. Mr. Kellogg, I noticed in the latter part of your statement, you said you must be given assurance by the Legislature that if they directed the Port to proceed to purchase this property, they must make a pledge to the bondholders there be no further projects involving rail. Now I appreciate that if the Legislature directs you to enter into a contract involving the issuance of bonds, there will be no impairment of obligations of contract, but I must call to your attention and the members of your Commission that one Legislature cannot bind a subsequent Legislature involving policy. If, perchance, may I illustrate  ten, fifteen, twenty years from now the respective legislatures of New York and New Jersey importune your Port Authority Commission to do something in addition involving public service, one legislature cannot bind another involving policy. Do you follow me? A. I do.
Q. I appreciate the legal end of it involving obligation of contract, but in your statement that you be given assurance that no further services should be required of you involving rail forever hereafter  and how this legislature could bind a subsequent legislature I do not know. A. We'd have to say that to the bondholders, the ones that were going to purchase the new bonds, that we as Commissioners believe that this would not endanger the 1.3 ratio.

* * * * * * * *
BY SENATOR COWGILL:
Q. I want to clear one thing up. I got a little confused there for a minute on that policy business  in the event that the H&M were acquired on the basis of statutes passed by New Jersey and New York, they would not be called upon, that is, the Port Authority would not be called upon, to go into any further commuter problems of other roads. If bonds were issued under such legislation, you would not be able to issue any further bonds for anything else unless you were willing to certify that it would not  A. That's correct. It wouldn't say that the bonds couldn't be issued with a state guarantee later on for something else or something of that type, freight or anything else.
Q. It seems to me on that basis, that you enter a contract on the basis of legislation passed, that contract is going to stand and some later legislature is not going to be able to change it. A. That's right.
SENATOR FARLEY:
My question, Senator, was  and I appreciate we cannot impair obligations: In effect, would any commitment with the present legislature *158 estop or attempt to estop any legislation involving public needs in the future? [No answer was given at this point].
Commissioner Clancy of the Port Authority followed Commissioner Kellogg to the stand and the following colloquy took place directed to the same point:
SENATOR FARLEY:
I say to you as a commissioner representing New Jersey we too have a responsibility of making sure that this is done thoroughly, intelligently and in a way that would be feasible and practical. It was testified today by Mr. Kellogg that the Port should not be bound by any other demand from the State Legislature relative to rail service. I pointed out to him  and may I say to you as a lawyer  we well appreciate that any direction we give you by enacting legislation, we could not impair any obligation such as contracts of bond issues. Likewise, you as a lawyer know that one legislature cannot bind the other involving policy five, ten, or twenty years hence. A. I appreciate that.
Q. So that when this Committee makes its report, we are not exonerating the Port from any responsibility for any demand for future public service by either the New York or New Jersey legislature. I want you to appreciate that fact. A. I appreciate that fully and I am aware of the fact if a situation such as that would arise in the future, that would be a matter that we would have to discuss on its own merits with a future Governor and future legislature.
Q. That's right.

* * * * * * * *
MR. TOBIN:
May I say something?
SENATOR FARLEY:
I want to call you, Mr. Tobin, relative to this situation. If you want to interject something at this time, we will be very happy to have you do so.
MR. TOBIN:
You might want to know that this legislative assurance, as Commissioner Kellogg pointed out, would only apply to future commuter *159 operations and only limits the use of the pledge of the general reserve fund. It only limits the pledge of the general reserve fund, nothing else. It would not typically bar Port Authority participation where some other scheme of guarantee of the bonds or something like that 
SENATOR FARLEY:
That would have to depend on its own merit or demerit and then be considered. But I call to your attention as a Commissioner the problem of the Legislature.
I am aware of the problem, but, of course, the action that is taken now with reference to the Hudson and Manhattan would not necessarily of itself bar future participation in the problem generally. It would, however, not be possible if that future participation involved any impairment of this reserve fund.
While the Farley Committee hearings were in progress the New York Legislature adopted legislation directing the Port Authority to acquire and operate the H&M, Laws of N.Y. 1961, c. 312, without any covenant against or limitation upon future Authority involvement in passenger rail transit. This legislation was not acceptable to the New Jersey Legislature because "the absence of such a covenant * * * endangered the future utility of the Port Authority to the two States." Report of Senate Investigation Committee Under Senate Resolution Number 7 of the Year 1961, at 23. The Committee's report, which was issued in 1963, notes that it sponsored the 1962 covenant legislation so as to limit
* * * by a constitutionally-protected statutory covenant with Port Authority bondholders the extent to which the Port Authority revenues and reserves pledged to such bondholders can in the future be applied to the deficits of possible future Port Authority passenger railroad facilities beyond the original Hudson & Manhattan Railroad system. [Id. at 24]
The 1962 covenant legislation was passed unanimously by both houses of the New Jersey Legislature on February 13, 1962 and Governor Hughes signed the bill on the same day. The New York Legislature followed suit on March 7, 1962, Laws of N.Y. 1962, c. 209, and the covenant legislation became *160 effective upon Governor Rockefeller's signature on March 27, 1962.
L. 1962, c. 8, authorized the Port Authority to proceed with the acquisition, construction and operation of a port development project which would include the World Trade Center and the H&M. N.J.S.A. 32:1-35.52. For this purpose the Authority was authorized to issue bonds for the project secured by a pledge of the general reserve fund. N.J.S.A. 32:1-35.53. The preamble of the act reflects the following legislative findings relevant to the H&M acquisition:
The States of New York and New Jersey hereby find and determine:
(1) that the transportation of persons to, from and within the Port of New York and the flow of foreign and domestic cargoes to, from and through the Port of New York are vital and essential to the preservation of the economic well-being of the northern New Jersey-New York metropolitan area;
(2) that in order to preserve the northern New Jersey-New York metropolitan area from economic deterioration, adequate facilities for the transportation of persons must be provided, preserved and maintained and that rail services are and will remain of extreme importance to such transportation of persons;
(3) that the interurban electric railway now or heretofore operated by the Hudson & Manhattan Railroad Company is an essential railroad facility serving the northern New Jersey-New York metropolitan area, that its physical plant is in a severely deteriorated condition, and that it is in extreme financial condition;
(4) that the immediate need for the maintenance and development of adequate railroad facilities for the transportation of persons between northern New Jersey and New York would be met by the acquisition, rehabilitation and operation of the said Hudson & Manhattan interurban electric railway by a public agency, and improvement and extensions of the rail transit lines of said railway to permit transfer of its passengers to and from other transportation facilities and in the provision of transfer facilities at the points of such transfers;

* * * * * * * *
(8) that the Port of New York Authority (hereinafter called the port authority), which was created by agreement of the 2 States as their joint agent for the development of the transportation and terminal facilities and other facilities of commerce of the port district and for the promotion and protection of the commerce of their port, is the proper agency to act in their behalf (either directly or by or through wholly-owned subsidiary corporations) to effectuate, as *161 a unified project, the said interurban electric railway and its extensions and the [World Trade Center] * * * [N.J.S.A. 32:1-35.50]
The operative provisions of the covenant are contained in the first paragraph of § 6 of chapter 8, N.J.S.A. 32:1-35.55, and they are as follows:
The 2 States covenant and agree with each other and with the holders of any affected bonds, as hereinafter defined, that so long as any of such bonds remain outstanding and unpaid and the holders thereof shall not have given their consent as provided in their contract with the port authority, (a) the 2 States will not diminish or impair the power of the port authority (or any subsidiary corporation incorporated for any of the purposes of this act) to establish, levy and collect rentals, tolls, fares, fees or other charges in connection with any facility constituting a portion of the port development project or any other facility owned or operated by the port authority of which the revenues have been or shall be pledged in whole or in part as security for such bonds (directly or indirectly, or through the medium of the general reserve fund or otherwise), or to determine the quantity, quality, frequency or nature of the service provided in connection with each such facility; and (b) neither the States nor the port authority nor any subsidiary corporation incorporated for any of the purposes of this act will apply any of the rentals, tolls, fares, fees, charges, revenues or reserves, which have been or shall be pledged in whole or in part as security for such bonds, for any railroad purposes whatsoever other than permitted purposes hereinafter set forth.
"Affected bonds" are defined as including all bonds secured in whole or in part by the general reserve fund or any other reserve fund established by contract between the Authority and the holders of its bonds. Since all consolidated bonds are secured by a pledge of the general reserve fund, as well as the consolidated bond reserve fund, all outstanding consolidated bonds, with the exception of those of the 40th and 41st series,[25] are affected bonds under the terms of the covenant.
"Permitted purposes" as defined in the statute include: (1) the H&M as it existed on the effective date of the legislation; *162 (2) any railroad freight facilities owned by the Authority; (3) railroad tracks on vehicular bridges owned by the Authority; and (4) passenger railroad facilities (other than the H&M) only if one of two conditions is met: (i) the Authority certifies that such other railroad facility is self-supporting, or (ii) if the general reserve fund contains the required statutory amount (10% of all outstanding Authority bonds) and the Authority certifies that the deficit of such other facility, together with the deficits of all other passenger railroad facilities owned by the Authority, will not exceed "permitted deficits" as thereafter defined.
A passenger railroad facility may be certified as "self-supporting" if its estimated average annual net operating income for the first ten years of operations is at least equal to the estimated average annual debt service on bonds issued in connection with the facility.
A passenger railroad "deficit" is defined as the average estimated annual debt service upon the bonds issued for passenger railroad purposes over the first ten-year period of operations less the average estimated annual net operating income of the railroad facility, or plus the average estimated annual net loss of the railroad facility. To illustrate: If the average annual debt service requirement is $10,000,000 and the average annual net operating income is $5,000,000, the statutory deficit is $5,000,000. If it is estimated that an average annual net loss of $5,000,000 will be incurred from operations, the statutory deficit would be $15,000,000.
A "permitted deficit" is a deficit which does not exceed (A) the amount of the passenger railroad deficit the payment of which one or both states is willing to guarantee for the period for which the Authority would be liable for such deficit, plus (B) the greater of (1) an amount equal to 10% of the general reserve fund at the end of the preceding calendar year less an amount equal to 1% of the Authority's bonds outstanding at the end of the preceding calendar year which were issued for passenger rail purposes (including the H&M), or (2) an amount equal to 10% of the amount *163 calculated under clause (1) plus 1% of the Authority's equity in all facilities other than passenger rail facilities.
Thus, assuming the States of New York and New Jersey enter into an agreement with the Authority to pay the deficit of a proposed passenger railroad facility, the deficit of such facility is a permitted deficit under the 1962 covenant and the Authority is authorized to issue its bonds for such purpose. In the absence of a guarantee by the states to pay any part of the deficit, the maximum permitted deficit must be calculated under (B) as reflected in the following illustration: Assuming the general reserve fund contains $175,000,000 and the Authority has outstanding bonds issued for the H&M and other passenger railroad purposes in the amount of $150,000,000, clause (1) permits the Authority to issue bonds secured by the general reserve fund if the estimated average annual deficits of all its passenger rail facilities, including the proposed facility, do not exceed $16,000,000 ($17,500,000 - $1,500,000). Assuming the same facts and an Authority equity in nonrailroad facilities of $1,200,000,000, under clause (2) the permitted deficit would be $13,600,000 ($1,600,000 + $12,000,000). Hence, on the assumed facts, since the amount calculated under clause (1) is greater, the permitted deficit would be $16,000,000[26].
On September 1, 1962, following enactment of the 1962 covenant legislation referred to above, the Port Authority, through a wholly-owned subsidiary (Port Authority Trans-Hudson Corporation or PATH), assumed ownership and operating responsibilities over the H&M. The Commissioners' 1962 certification with respect to the acquisition of the PATH System was made on the basis of an opinion of A. Gerdes Kuhbach, the Director of Finance of the Port Authority, *164 which was prepared at the request of the Commissioners. His opinion analyzed and reviewed the financial aspects and data relating to the proposed acquisition, rehabilitation and operation of the PATH system. He concluded that the section 7 certification required under the series consolidated bond resolutions could be made, since the anticipated net loss after debt service for the years 1969 through 1991 would level off at approximately $6,595,000[27] per year, an amount that would not impair the sound credit rating of the Port Authority. More specifically, Kubach concluded that
a) There is always a comfortable margin between the anticipated net loss and 10% of the estimated General Reserve Fund;
b) Net revenues available for Reserves will not be materially diluted by undertaking the acquisition, rehabilitation and operation of the Hudson Tubes:
c) The coverage of both annual obligatory long term debt service and future maximum debt service is sufficiently within the limits necessary to preserve the Port Authority's credit and to continue the issuance of Consolidated Bonds.
I therefore conclude that the application of all or any portion of unexpended proceeds of Consolidated Bonds, Nineteenth Series, Due 1991, will not during the years 1962 through 1991, in light of the estimated expenditures in connection with the Hudson Tubes, materially impair the sound credit standing of the Authority or the investment status of the Consolidated Bonds or the ability of the Port Authority to fulfill its commitments, whether statutory or contractual or reasonably incidental thereto, including its undertakings to the holders of Consolidated Bonds.
Since the enactment of the 1962 covenant the Port Authority has referred to the covenant in all official statements furnished to the public in connection with each series of consolidated bonds issued by the Authority. The reference is set forth under the heading "Statutory Covenant With Prior Affected Bondholders Against Dilution of Pledged Revenues and Reserves by Additional Passenger Railroad Deficits," and the terms of the covenant are then summarized. The first two sentences of text read as follows:
*165 In connection with the legislation which authorized the Port Authority to assume responsibility for the Hudson Tubes system the Port Authority had advised the Legislatures of both States that the credit of the Port Authority would be impaired by such an undertaking of an anticipated perpetual deficit facility unless the States would enter into an enforceable contract with the Port Authority bondholders which would grant assurances against dilution of already pledged revenues and reserves by any additional passenger rail deficits beyond those of the basic Hudson Tubes System. The legislation as finally adopted includes such statutory covenants.
As of December 31, 1973 the Authority had invested $185,800,000 of its funds in the acquisition and improvement of PATH. The accumulated operating deficits of PATH (determined in accordance with ICC accounting practices) total $125,000,000,[28] of which approximately $17,000,000 constitutes depreciation. PATH has incurred an annual deficit after debt service for each of the last five years in excess of 10% of the general reserve fund. Accordingly, under the 1962 covenant the Port Authority would be precluded from pledging any of its revenues or reserves to any other deficit passenger railroad operation. In 1973, using the Authority's accounting procedures, the PATH deficit for the year, including debt service, was $24,913,000.
Following the enactment of the 1962 covenant legislation an action was instituted in the New York state courts challenging the validity of the statute by New York property owners. The principal issues presented in the action dealt with the legislative authorization to the Authority to construct the World Trade Center. The plaintiffs urged, among other things, that the legislation was unconstitutional because no congressional consent had been obtained. The New York Court of Appeals upheld the constitutionality of the covenant legislation, and the appeal therefrom was dismissed by the United States Supreme Court for want of a substantial federal *166 question. Courtesy Sandwich Shop v. Port of N.Y. Auth., 12 N.Y.2d 379, 240 N.Y.S.2d 1, 190 N.E.2d 402, app. dism. 375 U.S. 78, 84 S.Ct. 194, 11 L.Ed.2d 141, reh. den. 375 U.S. 960, 84 S.Ct. 440, 11 L.Ed.2d 318 (1963). The Court of Appeals disposed of the consent argument in the following manner:
This argument must fail because, assuming consent to be required for this sort of concurrent action, the congressional consent originally given in 1921 and 1922 to the bi-State compact creating the Port Authority expressly contemplated such further co-operative legislation in furtherance of port purposes as was here accomplished. * * * Among the Articles of Agreement consented to were articles III, VII and VI, which created the Port Authority with the powers enumerated plus "such other and additional powers as shall be conferred upon it by the legislature of either State concurred in by the legislature of the other." Similarly, article XI, following the agreement for an initial comprehensive plan in article X, provides that the Port Authority should "from time to time make plans for the development of said district, supplementary to or amendatory of any plan theretofore adopted, and when such plans are duly approved by the legislatures of the two States, they shall be binding upon both States with the same force and effect as if incorporated in this agreement." Chapter 209 clearly falls within the congressional consent given to the articles contemplating the grant to the Port Authority of additional powers within the framework of the compact. [12 N.Y.2d at 391, 240 N.Y.S.2d at 7, 190 N.E.2d at 406]
The lack of congressional consent to the covenant legislation was also raised by Port Authority bondholders in Port Authority Bondholders Pro. Com. v. Port of N.Y. Auth., 387 F.2d 259 (2 Cir.1967). The Court of Appeals affirmed the dismissal of the bondholders complaint, having concluded that the United States Supreme Court's disposition in Courtesy Sandwich Shop had labeled the question "as unsubstantial." 387 F.2d at 262.
In 1971 Theodore Kheel, Esq., and others instituted a class action in the United States District Court for the Southern District of New York challenging the constitutionality of the 1962 covenant on the grounds that it restricted the Authority's power to devote its revenues to nonself-supporting passenger rail facilities, in violation of the Compact and *167 Commerce Clauses of the United States Constitution, and impaired legislative sovereignty. The District Court dismissed the complaint, relying in part upon the disposition made in Courtesy Sandwich Shop. Kheel v. Port of N.Y. Auth., 331 F. Supp. 118 (S.D.N.Y. 1971), aff'd on other grounds, 457 F.2d 46 (2 Cir.1972), cert. den. 409 U.S. 983, 93 S.Ct. 324, 34 L.Ed.2d 248 (1973).

Legislative History of the Repeal of the 1962 Covenant.
Despite the enactment of the 1962 covenant, during the latter part of the 1960's and continuing to date there has been increasing public and governmental demand for the Port Authority to make a greater contribution toward a solution of the mass transit problems within the Port District. The critics of the Port Authority, as well as responsible executive and legislative officials, have focused primarily upon the utilization of the surplus earning capacity of the Authority's existing facilities to finance further Authority acquisition of or direct subsidies to mass transit facilities. It may be noted that between 1961 and 1970 the net revenues of the Authority had increased from $68,000,000 to $115,000,000, and over that period the Authority had available to it $454,000,000 in funds in excess of its debt service requirements.
In July 1964 Congress enacted the Urban Mass Transportation Act of 1964 (49 U.S.C.A. §§ 1601 et seq.), expressing for the first time a federal legislative interest in the support of urban mass transportation systems. In enacting the 1964 act Congress found (49 U.S.C.A. § 1601(a)):
(1) that the predominant part of the Nation's population is located in its rapidly expanding metropolitan and other urban areas, which generally cross the boundary lines of local jurisdictions and often extend into two or more States;
(2) that the welfare and vitality of urban areas, the satisfactory movement of people and goods within such areas, and the effectiveness of housing, urban renewal, highway, and other federally aided programs are being jeopardized by the deterioration or inadequate *168 provision of urban transportation facilities and services, the intensification of traffic congestion, and the lack of coordinated transportation and other development planning on a comprehensive and continuing basis; and
(3) the Federal financial assistance for the development of efficient and coordinated mass transportation systems is essential to the solution of these urban problems.
The purposes of the 1964 act were declared to be (49 U.S.C.A. § 1601(b)):
(1) to assist in the development of improved mass transportation facilities, equipment, techniques, and methods, with the cooperation of mass transportation companies both public and private;
(2) to encourage the planning and establishment of areawide urban mass transportation systems needed for economic and desirable urban development, with the cooperation of mass transportation companies both public and private; and
(3) to provide assistance to State and local governments and their instrumentalities in financing such systems, to be operated by public or private mass transportation companies as determined by local needs.
The scope of the 1964 act was expanded by the Urban Mass Transportation Assistance Act of 1970 on the basis of a finding by Congress (49 U.S.C.A. § 1601a) that "the rapid urbanization and the continued dispersal of population and activities within urban areas has made the ability of all citizens to move quickly and at reasonable cost an urgent national problem."[29]
In April 1970 Governors Cahill and Rockefeller announced a joint program to increase the Port Authority's role in mass transportation by building a rail link to John F. Kennedy International Airport and extending PATH to Newark International Airport and other parts of New Jersey. *169 Bills were introduced in the New Jersey and New York Legislatures authorizing the Port Authority to undertake mass transportation projects providing access to John F. Kennedy and Newark International Airports. In March 1971 joint hearings were held in New York and New Jersey by the New York State Assembly Committee on Corporations, Authorities and Commissions and by the Autonomous Authorities Study Commission of the New Jersey State Legislature with respect to the relationship of the Port Authority to mass transportation and the proposed passenger rail links to the airports. In June 1971 the Legislatures of New York and New Jersey enacted legislation authorizing the Port Authority to extend passenger rail transportation to Kennedy International Airport and to Newark International Airport and Cranford. L. 1971, c. 245; N.J.S.A. 32: 1-35.20 et seq. The sponsors of this legislation sought to avoid the limitations of the 1962 covenant by characterizing the proposed new railroad facilities "as constituting a part of each air terminal" rather than independent passenger railroads. L. 1971, c. 245, § 1. While this legislation was pending, the Port Authority obtained opinion letters from two New York law firms which concluded that the proposed rail extensions were subject to the provisions of the 1962 covenant and could not be financed out of Port Authority revenues or reserves unless "self-supporting" since PATH had used up all of the "permitted deficits" allowed by the covenant.
Following the enactment of the 1971 legislation the Commissioner of the New Jersey Department of Transportation commissioned a consulting firm to report on the Authority's ability to finance and operate the New Jersey PATH extension under the terms of existing covenants with bondholders, and to propose alternative financing programs if the Authority could not. The consultant's report was submitted in December 1971. At the outset it was noted that on the assumption the proposed additional facilities would operate *170 at a deficit, the 1962 covenant prohibited Authority financing and operation since the PATH deficit already exceeded the "permitted deficits" allowed by the covenant. The conclusion of the report was that the Port Authority was not, under the 1962 covenant, in a "favorable position" to provide the additional financing necessary for the proposed extensions of existing passenger rail facilities. The consultants recommended as an alternative solution the removal of PATH from the Authority's control so that the latter would no longer be responsible for its deficits.
In June 1972 the Port Authority and New Jersey Department of Transportation concluded on the basis of an engineering cost study that the proposed extension of PATH via Newark Airport to Cranford was not economically feasible under the terms of the 1962 covenant.
In the same month the State of New York passed a bill repealing the 1962 covenant. Laws of N.Y. 1972, c. 1003. Governor Rockefeller's message on the signing of that legislation stated:
I am approving this bill in order to give incentive to the Port of New York Authority to proceed with urgently needed mass transportation facilities in the metropolitan region.
Passed with overwhelming bipartisan support in both houses of the Legislature, the bill removes the absolute statutory prohibition against the use of the revenues of the Port of New York Authority for railroad purposes. That statutory covenant, together with the provision of the bi-state compact creating the Authority that neither State will construct competing facilities within the Port District, could forever preclude the two states from undertaking vitally needed mass transportation projects. In removing the present restriction, the bill would not jeopardize the security of Port Authority bondholders or their rights to maintain that security.

* * * * * * * *
New York, by the enactment of this measure, is taking an essential step in its long-range effort to realize the full potential of the Port Authority in meeting the total transportation needs of the New York-New Jersey port district. The Port Authority's active participation in helping to solve the problems of mass transportation in the New York City metropolitan area will inure to the benefit not only of millions of area residents generally, but also to the port facilities operated by the Authority and the workers and businesses that rely *171 on them. This bill is consistent with the original purpose of the Port Authority  to ensure the coordinated development of terminal, transportation and other facilities of commerce in and about the port district for the greater benefit of the people of New York and New Jersey.
The repeal of the 1962 covenant adopted by New York proved to be unacceptable at that time to the New Jersey Legislature and Governor Cahill, and on November 15, 1972, following a series of meetings among Governors Cahill and Rockefeller and the Commissioners of the Port Authority, the Governors announced agreement on a bi-state plan of passenger rail transportation development by the Port Authority. The plan provided for the extension of PATH via Newark Airport to Plainfield, direct rail service from Kennedy Airport to New York City, and direct rail service to Penn Station, New York, for riders of the Erie Lackawanna Railroad in six northern New Jersey counties and two counties in New York. The estimated total cost of the plan was $650,000,000 and it was estimated that the Port Authority would invest between $250,000,000 and $300,000,000, with the balance of the funds being furnished by grants from the Federal Urban Mass Transportation Administration and the states. The Governors also proposed to repeal the 1962 covenant with respect to bonds issued subsequent to the enactment of the legislation proposed by the Governors.
On December 11, 1972 the New Jersey Senate held an information session to consider pending Port Authority mass transit bills. During this session representatives of the Port Authority and of Governor Cahill's office stated that the State of New Jersey would have to commit substantially all of the funds then available to the State of New Jersey from the Federal Urban Mass Transportation Administration.
The legislation embodying the 1962 covenant was amended by the State of New Jersey on December 28, 1972, L. 1972, c. 208, so as to repeal the 1962 covenant with respect to *172 Authority bonds issued after the effective date of the legislation. The New York Legislature enacted concurrent legislation which became effective on May 10, 1973. Laws of N.Y. 1973, c. 318.
On April 22, 1974 the New Jersey Legislature enacted chapter 25 of the Laws of 1974 (the "repeal act"). Governor Byrne signed the bill on April 30, 1974. Section 1 of this act repealed section 3 of chapter 208 of the Laws of 1972, the effect of which is to repeal, retroactively, the 1962 covenant as to all issued and outstanding "affected bonds" issued by the Port Authority. The introducer's statement annexed to the Assembly Bill No. 1304 (which became chapter 25), sums up the intent and purpose of the action taken:
This bill is designed to preclude the application of the 1962 covenant restricting port authority participation in mass transit projects. Chapter 208, P.L. 1972, precluded such application to bonds newly issued after the effective date of that act, but maintained in status quo the position of holders of bonds issued between March 27, 1962 and December 28, 1972. Since affected bonds are outstanding until the year 2007, the restrictions imposed by the covenant effectively preclude sufficient port authority participation in the development of a public transportation system in the port district. In 1972 the State of New York passed legislation precluding the application of the 1962 covenant from outstanding bonds as well as newly issued bonds. It is the purpose of this act to accomplish effective repeal of the covenant.
Concurring legislation was signed into law by Governor Wilson of New York on June 15, 1974. Laws of N.Y., c. 993. Governor Wilson issued a statement when he signed the bill, in which he said in part:
In response to my inquiry, the Chairman of the Port Authority has also advised me that because of the heavy long term capital commitments for the PATH facilities and the Kennedy rail link, the Authority has no significant capacity to contribute funds for operating subsidies for commuter railroads. Hence, the plain and simple fact of the matter appears to be that the Authority has virtually no excess funds that could be channeled into operating subsidies for mass transportation facilities in the New York metropolitan area. *173 Even if such funds were available, existing bond indenture provisions which survive despite repeal of the statutory covenant would prohibit their use except in relation to facilities owned, leased or operated by the Port Authority.
The legislative history of the repeal of the covenant would not be complete without reference to other developments which were of immediate and continuing concern to the states and the nation at or about the time the repeal legislation was enacted. Commencing in the early 1950's and continuing to date the two states initiated studies of air pollution problems in their jurisdictions, and legislative action to control air pollution was undertaken by New Jersey as early as 1954, see N.J.S.A. 26:2C-1 et seq., and by New York in 1957, see Laws of N.Y., c. 931. In 1955 the United States Congress enacted the Clean Air Act, 42 U.S.C.A. § 1857 et seq., the preamble of which sets forth the following findings (among others):
(a) The Congress finds 
(1) that the predominant part of the Nation's population is located in its rapidly expanding metropolitan and other urban areas, which generally cross the boundary lines of local jurisdictions and often extend into two or more States;
(2) that the growth in the amount and complexity of air pollution brought about by urbanization, industrial development, and the increasing use of motor vehicles, has resulted in mounting dangers to public health and welfare, including injury to agricultural crops and livestock, damage to and the deterioration and property, and hazards to air and ground transportation.
(3) that the prevention and control of air pollution at its source is the primary responsibility of States and local governments * * *
The studies which were undertaken identified automobile exhaust emissions as a significant contributing factor in air pollution, and as the primary source of air pollution in the City of New York. In 1962 the State of New York adopted legislation requiring the installation of positive crankcase devices on new cars. Laws of N.Y. 1962, c. 994. While similar legislation was not enacted in New Jersey, the State did institute on February 1, 1974 an auto emission *174 testing program as part of the mandatory motor vehicle inspection system.
The efforts of the states to alleviate health hazards associated with air pollution were given a major impetus by the congressional enactment in 1970 of amendments to the federal Clean Air Act, 42 U.S.C.A. § 1857 (c-l) et seq., pursuant to which the Administrator of the federal Environmental Protection Agency was authorized to establish national air quality standards and to prescribe, upon the failure of a state to do so, the steps necessary to achieve compliance with those standards.
On November 13, 1973, after the State of New Jersey failed to present an acceptable plan for achieving compliance with the national air quality standards for hydrocarbons and carbon monoxide, the federal Administrator promulgated regulations designed to achieve a major reduction in hydrocarbon and carbon monoxide pollution in the northern part of New Jersey. 38 Fed. Reg. 31388 et seq. The federally-mandated plan for New Jersey included the mandatory use of retrofit devices on gasoline-powered vehicles and "the application of certain transportation control measures including a requirement for a significant reduction in vehicle miles traveled." 38 Fed. Reg. 31389. The Administrator also emphasized the importance of the development of mass transit to the effort to improve New Jersey's air quality:
The development of large-scale mass transit facilities and the expansion and modification of existing mass transit facilities is essential to any effort to reduce automotive pollution through reductions in vehicle use. The planning, acquisition, and operation of a mass transit system is, and should remain, a regional or State responsibility. Many improvements are being planned in mass transit facilities in the State that will make it possible for more people to use mass transit instead of automobiles. * * * [38 Fed. Reg. 31389]
Finally, reference must be made to the energy crisis, the dimensions of which became a matter of national concern in the fall of 1973 with the imposition of an oil embargo by *175 Arabian suppliers of crude oil and the rapid escalation of the price of oil. On February 4, 1974, two months before the repeal legislation was enacted, the New Jersey Legislature passed the Emergency Energy Fair Practices Act of 1974 (L. 1974, cc. 2, 6).
Section 2 of that act stated:
The Legislature finds and determines that because of world conditions and the manner in which energy sources and fuels are allocated and distributed that an energy shortage now exists and may continue for the foreseeable future.
Section 3 of the act authorized the Governor "to proclaim by Executive Order the existence of an energy emergency" and to establish a State Energy Office and appoint an Administrator with broad powers to control the use and distribution of all fuels. On February 5, 1974 Governor Byrne issued Executive Order No. 1 in which he proclaimed the existence of an energy emergency, created the State Energy Office and established the position of Administrator of that office.
In December 1973 the Regional Plan Association issued a report on the relationship of the energy crisis to transportation. Its findings noted the decline of public mass transit in the metropolitan region and the increased consumption of fuel caused by reliance upon private automobiles to satisfy the major passenger transportation demand of the region. The Association pointed out that
If we are serious about meeting a profligate demand for energy over the long pull, we will have to begin now to design a Region that is less energy consumptive in transportation and in its development pattern.
While the immediate effects of the oil embargo have been dissipated, the nation is still confronted with the long-range effects of oil price increases, particularly as they bear upon the economic well-being of the country. On February *176 21, 1974 President Nixon described the problem in these terms in a special message to Congress on the energy crisis:
We must also face the fact that when and if the oil embargo ends, the United States will be faced with a different but no less difficult problem. Foreign oil prices have risen dramatically in recent months. If we were to increase our purchase of foreign oil, there would be a chronic balance of payments outflow which, over time, would create a severe problem in international monetary relations. [U.S.C. Cong. and Admin. News, 93rd Cong., 2d Sess. at 36.]
The President further observed, "it is widely recognized now that the development of better mass transit systems may be one of the key solutions to both our energy and environmental problems." Id. at 42. Congress has repeatedly made similar findings. For example, the Regional Rail Reorganization Act of 1973, enacted on January 2, 1974, contains specific findings by Congress that "rail service and rail transportation offer economic and environmental advantages with respect to * * * energy efficiency and conservation * * * to such extent that the preservation and maintenance of adequate and efficient rail service is in the national interest," and that "railroads are one of the most energy-efficient modes of transportation for the movement of passengers and freight." 45 U.S.C.A. §§ 701, 761.

Bondholder Reliance on the 1962 Covenant and the Effects of Repeal.
Commencing with the issuance of the 20th series of 1962 the Authority advised potential investors of the existence of and protection afforded by the 1962 covenant by including detailed reference to the covenant in the official statements distributed to the public. U.S. Trust alleges in its complaint that purchasers of the Authority's consolidated bonds relied on the notice thus given to them in making their purchases. It is also alleged that the repeal of the covenant has diminished and will continue to adversely *177 affect the value of the bonds in the secondary market.[30] These issues were the subject of a trial at which U.S. Trust produced four witnesses in its behalf, together with numerous exhibits. Defendants relied upon cross-examination of plaintiff's witnesses plus their own exhibits.
Port Authority consolidated bonds are known in the market place as revenue bonds, i.e., they are payable solely from the revenues and reserve funds derived from the facilities operated by the Authority. In the main these bonds are sold to relatively sophisticated institutional investors either for their own accounts or for the accounts of others whose investment funds they manage. Since the bonds carry a fixed rate of return and must compete against other similar types of securities available in the market place, the interest rate fixed when the bonds are initially marketed, as well as the price of the bonds in the secondary market, will normally reflect the investor's evaluation of the underlying security of his investment and the prevailing interest rates available on similar types of securities.
Prior to 1962 the Authority had successfully marketed several hundreds of millions of dollars of its consolidated bonds without the existence of the covenant. Presumably those issues were marketed on the strength of the Authority's overall revenues and reserves as well as in reliance on the previously enacted statutory covenants and the covenants contained in the CBR. The interest rates on these bond issues varied from a low of 2 3/4% (the 2nd and 4th series) to a high of 4 1/4% (16th series). The interest rate on the last bond issue offered prior to the enactment of the covenant was 3 1/2% (19th series).
In the early 1960's, prior to the enactment of the 1962 covenant, the likelihood of legislation directing the Authority to take over the H & M became apparent. The record strongly suggests that the Authority itself took the *178 initiative in arousing the concern of the investment banking community to the implications of such legislation for the future financial well-being of the Authority. Whether this action was attributable to the Authority's fear of the "disease" of mass transit, see Goldberg, at 22, or a legitimate concern as to the Authority's ability to absorb substantial mass transit deficits is not the point; the fact of the matter is that the Legislature of 1962 concluded it was necessary to place a limitation on mass transit deficit operations to be undertaken by the Authority in the future so as to promote continued investor confidence in the Authority.
The fact of the covenant's existence and its terms were communicated to the public and were a matter of general knowledge among investment bankers, institutional investors and dealers in Authority bonds. It may fairly be said, however, that few, if any, members of the investment community ever analysed closely the actual effect of the 1962 covenant upon bondholder security. The principal witness offered by U.S. Trust in support of its contentions, John F. Thompson, whose credentials and qualifications are impeccable, when asked to compare the protections afforded bondholders by the 1962 covenant with the restrictions imposed by the CBR (i.e., the 1.3 test and the section 7 certification required by the bond series' resolutions), testified:
Well the 1962 covenant and its requirements, require more specific determinations by the commissioners, by the staff and the commissioners as to the earnings or prospects of deficits involved, and they are  well, in the case of the Section 7 requirements, the commissioners can simply rule or state their opinion that the requirement would not harm the holders of the outstanding debt. In the case of the 1.3 times, they are permitted estimates of future earnings to some degree as well as the historical earnings. This is a test which might be complied with on the initiation of a deficit rail facility, and later be found to have not avoided deficits by any means as given the propensity of these deficits to greatly increase.
The determinations which must be made under the covenant, I believe, are much more susceptible to active testing, by those looking at the Port Authority from the outside, and those in the investment community a much more secure feeling about the future profitability of the Port Authority.
*179 Based upon the testimony offered by plaintiff, the investment community's understanding of the covenant was that it in some manner furnished "security for the bondholders and it protected the diversion of the earnings of the Port Authority into deficit mass rail transit." If the covenant is to be understood in that sense, the record supports plaintiff's claim that investors relied on the covenant in purchasing Authority bonds. But while reliance existed, the covenant cannot be said to have been the "primary consideration" for the purchases having been made, for no witness testified that purchases would not have been made without the covenant, but only that they would not have purchased or recommended the purchase of the bonds "at the price which they were then offered."
The limited role of the covenant on the Authority's credit standing is also reflected in the ratings assigned to Port Authority bonds by the principal rating services, Moody's and Standard and Poor's. Both have rated Authority bonds as "A" bonds, meaning that they are of investment quality and no default in payment of principal or interest is anticipated. The bonds carried the same rating prior to the enactment of the covenant, after it was enacted, after it was prospectively repealed, and after the repeal act of 1974. As suggested in the reports of the rating services, the rating assigned to Port Authority bonds is an amalgam of many factors, including not only the covenant but "the Authority's strong operating, financial and management record".[31]
Following the 1962 covenant legislation the Port Authority issued 20 series of bonds prior to the enactment of the prospective repeal which became effective on May 10, 1973. The interest rates on these bonds ranged from a low of 3-1/4% (20th series) to a high of 6-5/8% (35th series). After the prospective repeal was enacted, the Authority marketed *180 two additional bond issues, the 40th and 41st series, which carried interest rates of 6% and 5-1/2%, respectively. While it is claimed by plaintiff that the last two series of bonds are indirectly protected by the covenant until the "affected" bonds are retired in the year 2007, it is clear that the interest rates which the Authority has had to pay on non-affected bonds were not materially affected by the absence of direct covenant protection.
Plaintiff also attempted to show through its witnesses and exhibits that the repeal of the covenant adversely affected the secondary market for Authority bonds.[32] This conclusion was expressed by several witnesses who voiced the opinion that not only was the secondary market price of the bonds adversely affected, but that the nature of the market was altered in the sense that the market for the bonds became thin[33] and large institutional investors refused to purchase the bonds after repeal. There can be no question but that immediately following repeal and for a number of months thereafter the market price for Port Authority bonds was adversely affected. This was conclusively demonstrated by plaintiff's exhibits comparing the market price of selected Port Authority bonds, before and after repeal, with the prices of comparable bonds over the same period.
The problem presented by plaintiff's proofs, however, is that they do not show that the adverse effect attributable to the covenant repeal was permanent. Thus, immediately prior to repeal the price of Massachusetts Port Authority bonds was approximately two points higher than that quoted for New York - New Jersey Port Authority bonds having the same interest rate and a similar maturity.[34] The spread in *181 favor of "Mass Ports" fluctuated immediately after repeal but showed a market tendency to increase until it reached a maximum of 6-1/2 points on August 2. The spread continued to fluctuate thereafter and reached a maximum of 12 points by December 13, 1974. By January 3, 1975 the spread had narrowed to three points, and never exceeded four points through January 23, 1975. By the date of the trial the spread was reduced to two points, which is the same differential that existed prior to the effective date of the repeal.
Furthermore, beginning in August 1974 there were other factors which unquestionably contributed to the adverse price differential prevailing between Port Authority bonds and those of comparable issues. On August 15, 1974 the Wall Street Journal carried a story detailing the Authority's problems in completing and renting space in the World Trade Center. Then, on November 10, 1974, the New York Times ran a multi-column feature story with the headline "Port Authority Has Fallen on Hard Times." This story, like the one carried by the Wall Street Journal in August, referred to the Authority's difficulties at the World Trade Center and its losses on that project, estimated in the article to be as high as $25,000,000 a year.[35] The article also suggested that other Authority facilities which formerly had been profitable were breaking even or losing money. It is to be noted that Port Authority bonds suffered their sharpest decline for the whole period under review during the one month period following the New York Times article. On November 8, 1974 the bonds were quoted at 78, and by December 13, 1974 the price had dropped to 65.
The bottom line of plaintiff's proofs on this issue is simply that the evidence fails to demonstrate that the secondary market price of Authority bonds was adversely affected by the *182 repeal of the covenant, except for a short-term fall-off in price, the effect of which has now been dissipated insofar as it can be related to the enactment of the repeal

The Validity of the Repeal of the Covenant.
Plaintiff's position here is premised on the proposition that the 1962 covenant legislation created a contract between the States of New Jersey and New York and the bondholders of the Port Authority which prohibited the use of Port Authority revenues and reserve funds for passenger railroad purposes except as expressly permitted by the terms of the act. The repeal act of 1974, it is said, impairs the obligation of that contract in violation of U.S. Const., Art. I, § 10 of the United States ("No State shall * * * pass any * * * Law impairing the Obligation of Contract * * *") and N.J. Const. (1947), Art. IV, § VII, par. 3. ("The Legislature shall not pass any * * * law impairing the obligation of contracts * * *).[36]
At the outset it is essential to define the terms of the contract and the nature of the impairment claimed by plaintiff. When the 1962 covenant was enacted there was in existence the CBR of 1952, pursuant to which the Authority had pledged its net revenues and the reserve funds as security *183 for the payment of debt service on all consolidated bonds. The CBR and the series' resolutions, pursuant to which all outstanding consolidated bonds were issued, constitute a contract between the bondholders and the Authority, and that contract was unaffected by the enactment of the 1962 covenant. The covenant superimposed upon the security provisions of the CBR and the series' resolutions the further agreement of the states that neither the Authority's revenues nor its reserve funds would be used for any additional passenger railroad facility whose estimated deficit would exceed 10% of the amount in the general reserve fund.[37] To the extent that the repeal of the covenant authorizes the Authority to assume greater deficits for such purposes, it permits a diminution of the pledged revenues and reserves and may be said to constitute an impairment of the states' contract with the bondholders.[38]Bronson v. Kinzie, 42 U.S. (1 How.) 311, 11 L.Ed. 143 (1843); Planters' Bank of Miss. v. Sharp, 47 U.S. (6 How.) 301, 327, 12 L.Ed. 447 (1848); Hawthorne v. Calef, 69 U.S. (2 Wall.) 10, 17 L.Ed. 776 (1864); Von Hoffman v. City of Quincy, 71 U.S. (4 Wall.) 535, 18 L.Ed. 403 (1867); W.B. Worthen Co. v. Kavanaugh, 295 U.S. 56, 55 S.Ct. 555, 79 L.Ed. 1298 (1935); New Jersey Highway Authority v. Sills, 109 N.J. Super. 424 (Ch. Div. 1970), supplemented 111 N.J. Super. 313 (Ch. Div. *184 1970), aff'd 58 N.J. 432 (1971); First Nat'l Bank of Boston v. Main Tpke. Auth., 153 Me. 131, 136 A.2d 699 (Sup. Jud. Ct. 1957).
The Contract Clause addresses itself not only to the obligation, but also to the remedy and the security furnished to enforce the obligation and assure its performance. The first expression of this view of the Contract Clause occurs in Green v. Biddle, 21 U.S. (8 Wheat.) 1, 5 L.Ed. 547 (1823), which arose out of a compact between Virginia and Kentucky creating the latter as a separate state. Under the terms of the compact Kentucky agreed that all private rights and land titles derived from the laws of Virginia would "remain valid and secure" under Kentucky law. Thereafter, Kentucky enacted a series of laws designed to diminish and impede the remedies available to Virginia claimants to recover possession and the rents and profits of lands occupied by Kentucky residents. In holding the legislation invalid under the Contract Clause, Justice Story said:
It is no answer that acts of Kentucky, now in question, are regulations of the remedy, and not of the right to lands. If those acts so change the nature and extent of existing remedies, as materially to impair the rights and interests of the owner, they are just as much a violation of the compact as if they directly overturned his rights and interests." [21 U.S. (8 Wheat.) at 17].[39]
*185 In Von Hoffman v. City of Quincy, supra, bonds were issued by a city under existing Illinois law which authorized a special property tax to be levied in an amount sufficient to pay the interest on the bonds. The taxes thus collected were to be held in a separate fund specially pledged for the payment of the interest and not to be used for any other purpose. Subsequently, the legislature enacted a statute which limited the rate of property tax that could be levied by municipalities, and repealed the prior law authorizing the levy of a special tax for the benefit of bondholders. The property taxes collected by the city under the new law were insufficient to pay the interest due on the bonds. A bondholder instituted suit against the city and judgment was entered in his favor for the amount of interest owed on the bonds. The city failed to pay the judgment and refused to levy a property tax for such purpose. The judgment creditor thereupon sought a writ of mandamus to compel the city to pay the judgment or to levy a special tax. In its defense the city relied upon the repeal legislation as constituting a valid exercise of the state's sovereign power with respect to future public revenues, as to which it urged no binding contract could exist.[40] The court held the repeal legislation to be an invalid impairment under the Contract Clause. The court reaffirmed the doctrine laid down by Justice Story in Green v. Biddle, supra, this time describing the prohibited area in terms of an impairment of "substantial" rights, rather than a "material" impairment.
It is competent for the States to change the form of the remedy, or to modify it otherwise, as they may see fit, provided no substantial right secured by the contract is thereby impaired. No attempt has been made to fix definitely the line between alterations of the remedy, *186 which are to be deemed legitimate, and those which, under the form of modifying the remedy, impair substantial rights. Every case must be determined upon its own circumstances. Whenever the result last mentioned is produced, the Act is within the prohibition of the Constitution, and to that extent void. [71 U.S. at 553].
In its analysis of the issue presented the court viewed the question as addressing itself to the impairment of a remedy. However, the "remedy" in this context is actually the security furnished for the payment of the obligation, i.e., the authorization to levy a special property tax to pay the interest on the bonds.
This line of authority culminates in W.B. Worthen Co. v. Kavanaugh, supra, one of the last adjudications by the Supreme Court declaring repeal or amendatory legislation invalid under the Contract Clause. In Kavanaugh bonds had been issued by a municipal improvement district organized under the laws of Arkansas. At the time of issuance the statutory scheme to secure payment of the bonds provided for mortgage benefit assessments to be made against each parcel of property which "contained provisions well planned to make these benefit assessments an acceptable security." 295 U.S. at 57, 55 S.Ct. at 555. Thereafter, the legislature amended the statute so as to modify the procedures relative to defaulted obligations. The interest and penalties payable on default were substantially reduced, the time in which the property was to be sold for nonpayment was extended from 65 days to 2 1/2 years, and the property owner was permitted to remain in possession with a right of redemption for a further period of four years without accounting for rents. The court struck down the subsequent legislation under the Contract Clause and in the course of doing so it gave a more precise definition of what constitutes a prohibited impairment. Speaking for the court Justice Cardozo said:
In the books there is much talk about distinctions between changes of the substance of the contract and changes of the remedy. * * * The dividing line is at times obscure. There is no need for the *187 purposes of this case to plot it on the legal map. Not even changes of the remedy may be pressed so far as to cut down the security of a mortgage without moderation or reason or in a spirit of oppression. Even when the public welfare is invoked as an excuse, these bounds must be respected. * * * We state the outermost limits only. In stating them we do not exclude the possibility that the bounds are even narrower. The case does not call for definition more precise. A catalogue of the changes imposed upon this mortgage must lead to the conviction that the framers of the amendments have put restraint aside. With studied indifference to the interests of the mortgagee or to his appropriate protection they have taken from the mortgage the quality of an acceptable investment for a rational investor.

* * * * * * * *
Whether one or more of the changes effected by these statutes would be reasonable and valid if separated from the others, there is no occasion to consider. A state is free to regulate the procedure in its courts even with reference to contracts already made * * * and moderate extensions of the time for pleading or for trial will ordinarily fall within the power so reserved. A different situation is presented when extensions are so piled up as to make the remedy a shadow. * * * What controls our judgment at such times is the underlying reality rather than the form or label. The changes of remedy now challenged as invalid are to be viewed in combination, with the cumulative significance that each imparts to all. So viewed they are seen to be an oppressive and unnecessary destruction of nearly all the incidents that give attractiveness and value to collateral security. [295 U.S. at 60, 62, 55 S.Ct. at 557].
As the language of the court in the cases cited above makes manifest, not every impairment of a contract obligation or security for its performance runs afoul of the Contract Clause; a state acting under its reserved police powers may alter its remedial processes and thereby diminish contractual security provided it does not destroy its quality as "an acceptable investment for a rational investor." This view of the Contract Clause has its origin in the concurring opinion of Justice Johnson in Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 145, 3 L.Ed. 162 (1810). See Hale, supra at 873. Justice Johnson's conception of the states' reserved power under the Contract Clause was cogently expressed in his dissenting opinion in Ogden v. Saunders, 25 U.S. (12 Wheat.) 213, 6 L.Ed. 606 (1827), where he said:
*188 Societies exercise a positive control as well over the inception, construction, and fulfillment of contracts, as over the form and measure of the remedy to enforce them.

* * * * * * * *
It is, therefore, far from being true, as a general proposition, "that a government necessarily violates the obligation of a contract which it puts an end to without performance." It is the motive, the policy, the object, that must characterize the legislative act, to affect it with the imputation of violating the obligation of contracts. [25 U.S. (12 Wheat.) at 286, 291.]
Justice Johnson's formulation of the police power doctrine as applied to the Contract Clause was quoted with approval and forms the rationale for the court's decision in Home B. & L. Ass'n v. Blaisdell, 290 U.S. 398, 428-429, 54 S.Ct. 231, 78 L.Ed. 413 (1933). During the span of more than a century between Ogden v. Saunders and Blaisdell the court had held on numerous occasions that the states retained the power to impair contractual obligations  including those to which the state was a party  in the exercise of their always reserved police powers to act in the interest of the public health, safety and general welfare.[41] First in dictum, Boyd v. Alabama, 94 U.S. 645, 650, 24 L.Ed. 302 (1877), and then by direct application of the doctrine, the court held that a lottery franchise granted for a definite term of years could be repealed. Stone v. Mississippi, 101 U.S. 814, 25 L.Ed. 1079 (1880); Douglas v. Kentucky, 168 U.S. 488, 18 S.Ct. 199, 42 L.Ed. 553 (1897). In Northwestern Fertilizing Co. v. Hyde Park, 97 U.S. 659, 24 L.Ed. 1036 (1878), it was held that a franchise to operate a fertilizer factory at a given location could be negated by the exercise of the police power to abate a nuisance. Similarly, the power to control the use of the public streets may not be bargained away, Atlantic Coast Line R. Co. v. Goldsboro, 232 U.S. 548, 34 *189 S.Ct. 364, 58 L.Ed. 721 (1914); Denver & Rio Grande R. Co. v. Denver, 250 U.S. 241, 39 S.Ct. 450, 63 L.Ed. 958 (1919), nor can the state contractually bind itself not to exercise its power of eminent domain, West River Bridge Co. v. Dix, 47 U.S. (6 How.) 507, 12 L.Ed. 535 (1848); Pennsylvania Hospital v. Philadelphia, 245 U.S. 20, 38 S.Ct. 35, 62 L.Ed. 124 (1917), or to change the location of its governmental subdivisions, Newton v. Mahoning County, 100 U.S. 548, 25 L.Ed. 710 (1880). The broadest expression of this view of the police power during this period is to be found in Chicago & Alton R.R. v. Tranbarger, 238 U.S. 67, 35 S.Ct. 678, 59 L.Ed. 1204 (1915), where Justice Pitney said:
It is established by repeated decisions of this court that neither of these provisions of the Federal Constitution [the Contract and Due Process Clauses] has the effect of overriding the power of the state to establish all regulations reasonably necessary to secure the health, safety, or general welfare of the community; that this power can neither be abdicated nor bargained away and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise * * *. And it is also settled that the police power embraces regulations designed to promote the public convenience or the general welfare and prosperity, as well as those in the interest of public health, morals or safety. [238 U.S. at 76-77, 35 S.Ct. at 682]
The issue before the court in Blaisdell was the validity of the Minnesota Mortgage Moratorium Law. Once again the question was whether the state could exercise its sovereign power to impair the security provisions for the payment of a debt by a significant alteration of the remedies available for its enforcement. The act provided that during the economic emergency declared to exist, the state courts could upon application and notice extend the period of redemption from foreclosure sales and fix the rental value to be paid by the mortgagor in possession. The act also barred any action for a deficiency judgment until after the expiration of the redemption period. The court upheld the constitutionality *190 of the act, and Chief Justice Charles Evans Hughes described the reach of the Contract Clause:
To ascertain the scope of the constitutional prohibition, we examine the course of judicial decisions in its application. These put it beyond question that the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula.

* * * * * * * *
Not only is the constitutional provision qualified by the measure of control which the state retains over remedial processes, but the state also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end "has the result of modifying or abrogating contracts already in effect." Stephenson v. Binford, 287 U.S. 251, 276, 53 S.Ct. 181, 189, 77 L.Ed. 288. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while,  a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court. [290 U.S. at 428, 434-5, 54 S.Ct. at 236]
The line of demarcation between Blaisdell and Kavanaugh may be expressed as one of degree: The states' inherent power to protect the public welfare may be validly exercised under the Contract Clause even if it impairs a contractual obligation so long as it does not destroy it. While Blaisdell placed great emphasis upon the emergency character of the Minnesota law to validate the action taken, decisions of the court since then have sanctioned nonemergent legislation impairing contractual rights and remedies where necessary to protect the economic well being of the state. See Veix v. Sixth Ward B. & L. Ass'n of Newark, 310 U.S. 32, 60 S.Ct. 792, 84 L.Ed. 1061 (1940); Gelfert v. National City Bank, 313 U.S. 221, 61 S.Ct. 898, 85 L.Ed. 1299 (1941). Furthermore, in keeping with the principles set forth in Kavanaugh, we must deal with realities and not abstractions, for "[t]he Constitution is `intended *191 to preserve practical and substantial rights, not to maintain theories.'" Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502, 514, 62 S.Ct. 1129, 1133, 86 L.Ed. 1629 (1942).
The most recent case dealing with the issue, and that upon which defendants place greatest reliance, is City of El Paso v. Simmons, 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446, reh. den. 380 U.S. 926, 85 S.Ct. 879, 13 L.Ed.2d 813 (1965). The facts of the case may be briefly summarized. Texas law had provided for the sale of public lands on easy credit terms to raise money for school funds and to encourage land settlement. The credit terms set forth in the law governing such sales included a provision permitting the contract owner, were the land forfeited back to the State for nonpayment of interest, an unlimited time in which to reinstate the contract by payment of back interest, subject only to the rights of intervening third persons. In 1941, after a history of land title disputes and rampant speculation in such lands, Texas limited the right of reinstatement to five years. Upon expiration of this five-year period the State would have clear title. Simmons, owner of a quitclaim deed to land contracted for in 1910, had not made timely payment of the interest arrearages. His contract title was forfeited by the state which subsequently transferred the land to the City of El Paso. He instituted suit against the city to determine title to the land, urging that the 1941 law was a violation of the Contract Clause since it not only impaired his contractual right of reinstatement but destroyed it completely.
The 1941 legislation was held by the court to constitute a valid exercise of the state's power to modify or affect the obligation of its contracts. The essential question, in the court's view, was not whether the statute impaired the "obligation" or the "remedy", for not "every modification of a contractual promise * * * [or] every alteration of existing remedies * * * violates the Contract Clause." 379 *192 U.S. at 506-507, 85 S.Ct. at 582. Rather, the question was whether the modification of the contractual obligation to reinstate the purchaser's title was reasonable on the facts disclosed. Citing the legislative history, the court noted that Texas had a vital interest in "the integrity of land titles" and in the administration "of its property in a businesslike manner" (379 U.S. at 511-12, 85 S.Ct. at 585) and
* * * [t]he Contract Clause of the Constitution does not render Texas powerless to take effective and necessary measures to deal with [these matters]. * * * [T]he promise of reinstatement, whether deemed remedial or substantive, was not the central undertaking of the seller nor the primary consideration for the buyer's undertaking. * * * We do not believe that it can seriously be contended that the buyer was substantially induced to enter into these contracts on the basis of a defeasible [sic] right to reinstatement in case of his failure to perform * * *. We, like the Court in Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502, 514, 62 S.Ct. 1129, 1135, 86 L.Ed. 1629, believe that "[t]he Constitution is `intended to preserve practical and substantial rights, not to maintain theories.' * * *." 379 U.S. at 513-515, 85 S.Ct. at 586.

* * * * * * * *
The measure taken to induce defaulting purchasers to comply with their contracts * * * was a mild one, indeed, hardly burdensome to the purchaser who wanted to adhere to his contract of purchase, but nonetheless an important one to the State's interest. The Contract Clause does not forbid such a measure. [379 U.S. at 516-517, 85 S.Ct. at 588]
The view of the Contract Clause and its subservience to the police power as expressed in Blaisdell and El Paso coincides with the interpretation placed upon the Contract Clause of the New Jersey Constitution as interpreted by our highest courts. Thus, in Hourigan v. North Bergen Tp., 113 N.J.L. 143 (E. & A. 1934), Justice Heher cited Blaisdell with approval for the proposition that "the reservation of essential attributes of sovereign power" is to be read into the contracts of the State. He there defined the police power as
*193 * * * an exercise of the sovereign right of the government to protect the lives, health, morals, comfort and general welfare of the people and [it] is paramount to any rights under contracts between individuals. While this power is subject to limitations in certain cases, there is a wide discretion on the part of the legislature in determining what is and what is not necessary  a discretion which courts ordinarily will not interfere with. [at 149]
Neither New Jersey Highway Auth. v. Sills, supra, nor New Jersey Sports & Expos. Auth. v. McCrane, 61 N.J. 1 (1972), app. dism. 409 U.S. 943, 93 S.Ct. 270, 34 L.Ed.2d 215 (1972), suggests that our present Supreme Court has adopted a narrower interpretation of the Contract Clause of either the State or the Federal Constitutions. In Sills the court viewed a statute exempting National Guardsmen from the payment of tolls on the Parkway as "ordinary and relatively unimportant legislation" not intended to deal with "any problem of state-wide importance" as was the case in El Paso (111 N.J. Super. at 320). And in McCrane the Supreme Court expressly affirmed that while a contract between the State and the bondholders of an independent governmental authority is entitled to protection under the State and Federal Constitutions, such contracts are nevertheless subject to "a proper exercise of the State's never abdicated police powers." 61 N.J. at 26.[42]
The history of the creation and evolution of the Port Authority establishes beyond peradventure that it was intended by the states and by the Congress to perform governmental *194 functions necessary and vital to the public safety, health and welfare of the citizens of the two states and the nation as well. Cf. Comm'r of Int. Rev. v. Ten Eyck, 76 F.2d 515, 518 (2 Cir.1935). The states have a continuing interest in and can never abdicate their sovereign powers to control and direct the activities of the Authority to meet the everchanging needs of a complex society. See Blaisdell, supra, 290 U.S. at 442, 54 S.Ct. 231. Senator Farley summed it up when he advised Commissioner Kellogg in 1961:
* * * I appreciate that if the Legislature directs you to enter into a contract involving the issuance of bonds, there will be no impairment of obligations of contract, but I must call to your attention and the members of your Commission that one Legislature cannot bind a subsequent Legislature involving policy. If, perchance, may I illustrate  ten, fifteen, twenty years from now the respective legislatures of New York and New Jersey importune your Port Authority Commission to do something in addition involving public service, one legislature cannot bind another involving policy. [Supra at 157]
The interest of the states in the development of a coordinated system of public and private transportation within the Port District has been spread on the public record for more than 50 years, and legislative action to accomplish that objective clearly involves an exercise by the states of their fundamental sovereign powers. The enactment of the 1962 covenant was indeed an attempt to satisfy an immediate public need to preserve the H&M as a viable public transportation system. The passage of time and events between 1962 and 1974 satisfied the Legislatures of the two states that the public interest which the Port Authority was intended to serve could not be met within the terms of the covenant.
The events which occurred between the passage of the covenant and its repeal are described elsewhere in this opinion (supra at 167-176) and need not be detailed again. Suffice it to say that between 1962 and 1974 the security afforded bondholders had been substantially augmented by a vast increase in Authority revenues and reserves, and the Authority's financial ability to absorb greater deficits, from *195 whatever source and without any significant impairment of bondholder security, was correspondingly increased.[43] During the same interval mass transit facilities within the District continued to deteriorate while the public need for such facilities became unprecedented as the result of the promulgation of stringent federal air pollution regulations designed to reduce automobile usage and the emergence of an energy crisis which threatened the entire system of private automobile transportation in the two States.[44]
"The motive, the policy [and] the object" of the repeal legislation, read against its background, was to further a vital interest of the states which their Legislatures deemed to be essential to the public good. The question is whether the exercise of such power falls within the prohibited scope fo the Contract Clause, or does it, in the language of Chief Justice Hughes in Blaisdell, represent "a rational compromise between the individual rights and the public welfare." 290 U.S. at 442, 54 S.Ct. at 241.
Conceding the existence of some impairment of bondholder security as a result of the repeal, has the action of *196 the states destroyed the quality of their security as an "acceptable investment for a rational investor"? The repeal, of course, leaves intact the provisions of the CBR and the series resolutions which now constitute, together with the General Reserve Fund Act, the same measure of the bondholders' contractual security rights as existed prior to the enactment of the covenant in 1962. Presumably, rational investors  including plaintiff  purchased hundreds of millions of dollars of consolidated bonds prior to 1962, without the additional security afforded by the covenant and with full knowledge of the power of the states to direct the Authority into mass transit operations. The two principal bond rating services, upon whose judgment the financial community places great reliance, rated the consolidated bonds  minus the covenant  as securities as to which no default was anticipated.
The claim that bondholder security has been materially impaired or destroyed by the repeal is simply not supported by the record. The pledge of the Authority's net revenues and reserves remains intact; the Authority will still be barred from the issuance of any new consolidated bonds unless the 1.3 test required by the CBR is met, and the Authority will continue to be prohibited from the issuance of any consolidated bonds or other bonds secured by a pledge of the general reserve fund without the certification required by section 7 of the series resolutions, to wit, that in the opinion of the Authority the estimated expenditures in connection with any additional facility for which such bonds are to be issued would not, for the ensuing ten years, impair the sound credit standing of the Authority, the investment status of its consolidated bonds, or the Authority's obligations to its consolidated bondholders.
Plaintiff's claim of an unconstitutional impairment is predicated upon such slender reeds as the assertion that the "quality" of the certification required under the CBR and section 7 need not be as "objective" as that required under the covenant; the speculation that the good judgment of the Authority's commissioners in making the necessary *197 certifications will be overborn by the "political pressures" exerted by the Governors of the States,[45] and the self-flagellating prospect that the states will conspire to "give" the New York City subway system to the Authority and thereby destroy not only the bondholders' security but the Port Authority as well. But as the court stressed in Faitoute, supra, constitutional questions must be decided in the world of reality and not by resort to abstract speculations of the kind offered by plaintiff.
The thrust of plaintiff's argument is that any impairment of the security provisions of a contract violates the Contract Clause. It seeks to recreate a theory of the Contract Clause which, if ever imbedded in our constitutional law, no longer exists. As reflected in the course of more than 150 years of its judicial interpretation, the Contract Clause must be construed in harmony with the power of the states to alter or modify their contractual obligations where an important public interest requires. Those who enter into contractual relations with the sovereign, including the bondholders of the Port Authority, are chargeable with the knowledge that it is a sovereign entity with which they are dealing and that "the reservation of [the] essential attributes of sovereign power" is as much a part of their contract as that which is expressly stated.
It is the judgment of this court that the repeal legislation was a reasonable and hence valid exercise of the states' police power which is not prohibited by the Contract Clause of either the Federal or the State Constitution. An order will therefore be entered dismissing the complaint of plaintiff and in favor of defendants on so much of their counterclaim as seeks a declaratory judgment with respect to the constitutional validity of chapter 25 of the Laws of 1974.
*198 In view of the court's holding in the U.S. Trust action, defendant's third separate defense (asserting the invalidity of the 1962 covenant) and the complaint in the Gaby action will be dismissed. See Wagner v. Ligham, 37 N.J. Super. 430 (App. Div. 1955).
NOTES
[1] Under the terms of the Compact of 1921 creating the Port Authority, N.J.S.A. 32:1-1 et seq., legislative action taken by one state affecting the powers and duties of the Port Authority is not effective until concurred in by the legislature of the other. N.J.S.A. 32:1-8. Statutory citations in this opinion will be limited to the applicable New Jersey statutes unless the context otherwise requires.
[2] In 1972 the Legislature had repealed the 1962 covenant as to all bonds of the Authority issued after the effective date of the act. L. 1972, c. 208; N.J.S.A. 32:1-35.55a. The act became effective upon the adoption of concurrent legislation by the State of New York on May 10, 1973. Laws of N.Y. 1973, c. 318. The validity of this legislation is not in issue in these proceedings.
[3] Pub. Res. No. 17, 67th Cong., 1st Sess. (42 Stat. 174).
[4] The enabling legislation directed the commissioners to negotiate and agree upon a joint report recommending a policy for the states "to the end that said port shall be efficiently and constructively organized and furnished with modern methods of piers, rail and water and freight facilities * * *." The Commission was to work out "a comprehensive and adequate interstate and Federal port policy, to meet commercial needs in times of peace and the protection of the harbor and adjacent localities in times of war." L. 1917, c. 130.
[5] Joint Report with Comprehensive Plan and Recommendations, New York, New Jersey Port and Harbor Development Commission, 1920 (hereafter cited as the Report).
[6] The recommendation for a Compact between the States was originally contained in the Commission's preliminary report submitted in 1918.
[7] The name of the Port of New York Authority was changed to the Port Authority of New York and New Jersey on July 1, 1972. N.J.S.A. 32:1-4.
[8] The Holland Tunnel had been constructed by state commissions pursuant to a compact between the states which received the consent of Congress. In 1930 the Holland Tunnel was transferred to the Port Authority in order to enable it to honor its obligations to bondholders in the face of deficits incurred in connection with the Arthur Kill, George Washington and Bayonne Bridges. L. 1930, c. 247.
[9] The Authority covenanted, by the CBR, that no additional general and refunding, air terminal or marine terminal bonds shall be issued.
[10] As noted infra, although general and refunding, air and marine terminal bonds are still outstanding, the Authority has fully funded its obligations to those bondholders and the consolidated bonds presently have a first call upon all revenues of the Authority.
[11] While section 3 of the CBR provides alternate conditions for the issuance of consolidated bonds, in practice the 1.3 test described above is the least restrictive and has been the only one employed by the Port Authority since the adoption of the CBR. Goldberg, at 19.
[12] There is a dispute between the parties to this litigation whether a projected operating deficit of a facility to be acquired by the issuance of consolidated bonds must be deducted from net revenue for the purpose of determining whether the 1.3 test has been met. Under the terms of the CBR, if the facility to be acquired has been in operation for at least 36 months prior to the issuance of consolidated bonds, the annual operating deficit of the facility would be deducted from historical Authority net revenues in applying the 1.3 test. However, according to an Authority witness, if the facility to be acquired has not been in operation for at least 36 months, its projected operating deficit can be ignored. This view is contrary to the position of the Authority in statements made and testimony given to the Farley Committee. See infra, pages 152, 155-156.
[13] For this purpose the Authority is permitted to select any consecutive 12-month segment out of the 36-month period preceding the date of issuance of new consolidated bonds.
[14] The estimated average annual net revenue is based on estimated revenues for the first 36 months of operation of the new facility.
[15] For the calendar year 1973, of the 22 facilities operated by the Authority, 14 were operated at a deficit, i.e., the gross revenues were not sufficient to cover operating expenses and debt service requirements.
[16] This total includes $200,000,000 of bonds issued as the 40th and 41st series following the prospective repeal legislation of 1973, which are not "affected bonds" and hence not covered by the terms of the 1962 covenant.
[17] As at December 31, 1974 the Authority owed to various banks on short term loans $255,000,000. During 1974 the banks were repaid $40,000,000, plus interest, from the consolidated bond reserve fund, which accounts for the difference between the amount available for transfer to the reserve fund and the actual increase in the reserve fund balance at the end of the year.
[18] The preamble to the North Jersey Transit Commission Act of 1922, see infra, notes that the Port Authority Comprehensive Plan "does not include the problem of passenger traffic in the territory covered by said port development plan." L. 1922, c. 104.
[19] For the purpose of this opinion the term "rapid passenger transit" has reference to transportation of passengers by railroad and will be used interchangeably with the terms "commuter transit" and "mass transit," although the latter terms conceivably could involve means of conveyance other than by railroad.
[20] In 1936 the states requested the Port Authority to report on interstate and suburban passenger transportation. Jt. Res. No. Laws of 1936. The Port Authority filed its report in 1937, which disclaimed its financial ability to undertake a solution to the transit problems of the District.
[21] As of this date the four private companies which operate commuter railroad services in New Jersey are all being reorganized under federal bankruptcy laws.
[22] By 1959 the four commuter railroads operating in northern New Jersey sustained a total passenger operating deficit of $58,300,000. The New York commuter railroads had an aggregate deficit from commuter operations estimated at between $10,000,000 and $15,000,000 for 1960. The Staten Island Ferry operated at a loss of about $6,000,000 for the year, and the New York City Transit System had an operating deficit of $20,000,000, exclusive of debt service charges of $87,000,000.
[23] The New Jersey Metropolitan Rapid Transit Commission was created pursuant to L. 1952, c. 194 and was consolidated with its New York counterpart by L. 1954, c. 44.
[24] In view of recent developments it should be noted that in its statement the Authority also opposed an increase in tolls for the Hudson River crossing since this would constitute an "unfair tax" upon motorists to subsidize rail transit.
[25] See infra at 179-180.
[26] Since the annual deficits of the H&M (operated by the Authority under the acronym PATH) are substantially in excess of the permitted deficits calculated under 1963 covenant formula, the covenant prohibits the Authority from issuing any bonds for passenger rail purposes which would be secured by a pledge of the reserve funds of the Authority. See infra at 165.
[27] In 1962 the general reserve fund was approximately $69 million.
[28] Using the Authority's method of accounting, the accumulated PATH deficit as of December 31, 1973 was $153,073,000, inclusive of debt service.
[29] In November 1974, after the repeal of the 1962 covenant, Congress enacted the National Mass Transportation Assistance Act of 1974, which provided $11.8 billion over the next six years for mass transit capital expenditures and, for the first time, operating subsidies on a matching basis.
[30] The secondary market in this context refers to the over-the-counter price at which the bonds are traded after the initial offering.
[31] As expressed by one of the witnesses, the Authority "has been well-run, well-organized, well-managed * * *. It's continually shown good revenues."
[32] The repeal became effective when the concurrent New York legislation was signed by Governor Malcolm Wilson on June 15, 1974.
[33] A "thin" market is one characterized by a low volume of trading in which the price structure of the market is subject to sharp fluctuation by relatively small buy or sell orders.
[34] The bonds prices referred to in the text are derived from Exhibits P-90 and S-3 and the trial transcript.
[35] The latest available figures disclose that the World Trade Center incurred a deficit for the year 1973 of $16,460,000.
[36] Plaintiff also urges that the repeal act contravenes the Fifth and Fourteenth Amendments of the United States Constitution and Article I, par. 20 of the New Jersey Constitution. The contention is that the repeal constituted a "taking" of property without due process of law, i.e., just compensation. This issue will not be considered in this opinion for the following reasons: (1) to the extent that the claim is based upon an alleged reduction in the secondary market price of Authority bonds, it has been factually rejected supra, and (2) the test of constitutional validity as applied to repeal legislation is the same under the Contract and Due Process Clauses, i.e., if an unlawful impairment has occurred there has been a "taking," and if not, then there is no taking. See Veix v. Sixth Ward B. & L. Ass'n, 310 U.S. 32, 41, 60 S.Ct. 792, 84 L.Ed. 1061 (1940); Lynch v. United States, 292 U.S. 571, 578-581, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); Hale, "The Supreme Court and the Contract Clause: III," 57 Harv. L. Rev. 852, 890 (1944).
[37] The statutory formula for permitted deficits is set forth in more precise detail, supra at 162-163.
[38] It is not disputed by defendants that a legislative enactment, such as the 1962 covenant, may constitute a contract. Such has been the law since Fletcher v. Peck, 10 U.S. (6 Cranch.) 87, 3 L.Ed. 162 (1810). See also, New Jersey v. Yard, 95 U.S. 104, 114, 24 L.Ed. 352 (1877), where the court said: "It has become the established law of this Court that a legislative enactment * * * may contain provisions which * * * become contracts * * * within the protection of the [Contract Clause]." The legislative history associated with the enactment of the 1962 covenant as well as the statutory language used establish fairly conclusively that the Legislature intended the covenant to be a contract between the states and the bondholders of the Authority.
[39] Upon rehearing in Green v. Biddle, Justice Washington delivered the opinion of the court containing perhaps the most extreme expression of the reach of the Contract Clause rendered by the court:

The objection to a law, on the ground of its impairing the obligation of a contract, can never depend upon the extent of the change which the law effects in it. Any deviation from its terms, by postponing, or accelerating, the period of performance which it prescribes, imposing conditions not expressed in the contract, or dispensing with the performance of those which are, however, minute or apparently immaterial in their effect upon the contract of the parties, impairs its obligation. [21 U.S. (8 Wheat.) at 8488]
In contrast to the language of Justice Story quoted in the text above, Justice Washington states that any impairment, whether or not material to the obligation, violates the Contract Clause. It is doubtful whether this view was ever embraced by the court at any time. But see Planters' Bank of Miss. v. Sharp, 47 U.S. (6 How.) 301, 327, 12 L.Ed. 447 (1848); Ogden v. Saunders, 25 U.S. (12 Wheat.) 213, 256, 6 L.Ed. 606 (1827).
[40] The Supreme Court had earlier rejected this argument in a different context. See New Jersey v. Wilson, 11 U.S. (7 Cranch.) 164, 3 L.Ed. 303 (1812).
[41] For a more detailed discussion of the development of the doctrine, see Wright, The Contract Clause and the Constitution, 196-213 (1938).
[42] In their brief and at oral argument defendants ask the court to pass upon the validity of the New York repeal act under the New York Constitution. While it would unquestionably be desirable to do so in the interest of resolving all issues within the context of this litigation, that question should be left to the New York courts for decision. Cf. Interstate Wrecking Co. v. Palisades Interstate Park Comm'n, 57 N.J. 342, 352 (1971). It may be noted that U.S. Trust has filed a declaratory judgment action in the New York Supreme Court which is presently pending.
[43] Between 1961 and 1973 the net revenues of the Authority increased from $68,000,000 to $137,000,000, and over that period the Authority had available to it $582,732,000 in excess of its debt service requirements, after taking into account the deficits of the H&M. Through 1974, the corresponding figures are $161,283,000 and $649,750,000, respectively.
[44] Plaintiff urges that none of the legislative history (detailed at 167-176, supra) which preceded the repeal of the covenant should be considered relevant to the question of whether the repeal constituted a reasonable exercise of the states' police powers inasmuch as the repeal legislation was unnecessary and the Legislature made no findings or declarations with respect to such matters. A judgment as to the necessity of the legislation is for the Legislature and not the courts. See Hourigan v. North Bergen Tp., supra 113 N.J.L. at 149. Nor is the Legislature required to make explicit findings and declarations within the context of the legislation to support an exercise of the police power. See Gelfert v. Nat'l. City Bank of N.Y., supra 313 U.S. at 235, 61 S.Ct. 898; Bucsi v. Longworth B. & L. Ass'n, 119 N.J.L. 120, 122 (E. & A. 1937), app. dism. 305 U.S. 665, 59 S.Ct. 154, 83 L.Ed. 431 (1938).
[45] At the same time plaintiff argues that the covenant's requirement of a certification by the Governors is an "added" protection afforded them by the covenant.